Vivian **WOOLFOLK** et al.

v.

**Otis L. BROWN** et al.

**Civ. A. No. 225–70.**

United States District Court, E. D. Virginia, Richmond Division.

April 23, 1973.

John M. Levy, Neighborhood Legal Aid Society, Richmond, Va., for plaintiffs.

Theodore Markow, Richmond, Va., Vann Lefcoe, Asst. Atty. Gen., Commonwealth of Virginia, Richmond, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

This matter is now before the Court pursuant to a motion for contempt made by plaintiffs and a cross motion for summary judgment by defendants. Jurisdiction is attained pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 1343(3).[1]

Plaintiffs, who appear both individually and as members of a class they represent, at the time of suit were recipients of Aid to Families with Dependent Children (AFDC) benefits, a federal program established by the Social Security Act, 49 Stat. 620, as amended, 42 U.S.C. §§ 301–1394 (1935). Grants thereunder, the major part of which are provided by the Federal government, are distributed for the purposes of "encouraging the care of dependent children in their own homes . . . to help maintain and strengthen family life" and "furnish[ing] financial assistance and rehabilitation and other services . . . to needy dependent children and the parents and relatives with whom they are living." 42 U.S.C. § 601. Under AFDC a family unit receives aid if the dependent child is needy according to standards of need established by the cooperating *state* and if the child is deprived of parental support for various specified reasons. 42 U.S.C. § 606.

In an effort to curb the number of AFDC recipient families, Congress in 1967 amended the Social Security Act to provide for the Work Incentive Program (WIN), by which it was sought to encourage poverty level AFDC recipients to achieve economic independence through gainful employment. 42 U.S.C. § 602. Pursuant to WIN, "appropriate" persons receiving AFDC aid are referred to the Secretary of Labor for participation in a compulsory program providing either employment in the regular economy, training therefor or employment in publicly financed special work projects. An "appropriate" person refusing to participate in WIN after referral is subject to termination of individual benefits.

Because the WIN program has coercive elements, extensive statutory safeguards have been provided. The welfare agency's decision that a recipient is appropriate for referral to the program is subject to examination in a fair hearing. 42 U.S.C. § 602(a)(4), 45 C.F.R. § 220.-35(a)(15), Department of Health, Education and Welfare, Social and Rehabilitation Service, Guidelines for the Work Incentive Program § 42.

A second hearing may occur after referral; the issue here is whether the individual refused without good cause to participate in a WIN program or to accept a bona fide employment offer. This hearing is conducted by the representative of the Secretary of Labor 42 U.S.C. § 633(g), 45 C.F.R. § 220.-35(a)(16). U.S. Department of Labor, Manpower Administration, Work Incentive Program Handbook, § 412(H)–(K).

The statute provides specifically the sanctions which apply to those who are determined by the Secretary of Labor pursuant to § 633(g) to have refused without good cause to participate in a work incentive program or to accept an employment offer. Sanctions apply only to those who are involuntarily referred. § 602(a)(19)(F), 45 C.F.R. § 220.-35(a)(6)(ii). If good cause for refusal is lacking, the AFDC grant of the individual *child or recipient* terminates. 42 U.S.C. § 602(a)(19)(F)(i)(iv). The cut in aid does not take place, however, for a period of 60 days, if during that time the individual accepts counseling designed to encourage him to resume participation, 42 U.S.C. § 602(a)(19)(F), 45 C.F.R. § 220.35(a)(8).

The legislation leaves substantial latitude to the states in determining who is "appropriate" for referral to the work incentive program. By regulation, those subject to mandatory referral include unemployed fathers (when included in

---

1. This suit was initially brought before a three-judge panel which remanded is back to this Court for disposition.

the state's plan) and dependent children over age 16 and not employed attending school. 45 C.F.R. § 220.35(a)(1)(iv), H.E.W. Guidelines § 41.1. Others may be included within the mandatory category. The Virginia WIN regulations at the time of suit listed as "appropriate" dependent youths, as required, and "mothers and other caretaker relatives who are not currently participating in a work or training program," Virginia Department of Welfare and Institutions, Manual of Procedure, Work Incentive Program, § 201A.

Referral is to be prompt, *Id.*, § 204, as the statute and regulations require, 42 U.S.C. § 602(a)(19)(A), 45 C.F.R. § 220.34(a)(1)(iii), and is not postponed by reason of the lack of an existing WIN program to which the appropriate person can be assigned. 45 C.F.R. § 220.35(a)(1)(iii). These provisions apply to voluntary as well as compulsory referrals.

Virginia's criteria of appropriateness for compulsory referral exclude from participation in the WIN program "a person living in such an isolated area, without transportation, that it would be infeasible for him to participate in the WIN program," DWI WIN Manual, § 203.1B. It should be noted that regulations concerning appropriateness relate only to compulsory referrals. Volunteers are to be referred despite a determination of inappropriateness unless the local welfare department finds that enrollment in WIN would adversely affect child development and family cohesiveness, DWI WIN Manual, § 203.2. This is in accordance with federal law, 42 U.S.C. § 602(a)(19)(A)(iii).

In May of 1967, just prior to the enactment of WIN, the State of Virginia adopted §§ 211.4 E and F of the Virginia Manual of Policy and Procedure for Local Welfare Departments, hereinafter referred to as the Virginia Work Rule. Like the WIN program which came after, the Work Rule was designed to reduce the State's welfare rolls by encouraging recipients to work.

The original regulation in question read as follows:

E. *Evaluation of Employment Opportunities*—An applicant for or recipient of assistance is expected to make use of or develop resources available to him in relation to his capacity to do so. If it appears that he has a potential for employment, the extent of services needed from the worker will vary according to the individual's characteristics, training and working experience, as well as his environmental circumstances. The worker needs to be sensitive to the factors affecting the individual's ability to assume a worker role and to be aware of the point at which he may be expected to avail himself of work opportunities. A work opportunity is considered available to an individual, provided he is deemed able to assume a worker role, if the following conditions are met:

1. *Availability of a Specific Job*—The availability to the particular individual of a specific job within his competence must be established. The name and address of the prospective employer, the type of work, amount of wages and working hours must be recorded.

2. *Physical and Mental Capacity*—The individual must be able, physically and mentally, to perform the duties of the job available to him. If there is doubt as to his physical or mental capacity to do the work, an evaluation of his condition is to be secured by the agency from the appropriate source, such as a physician or psychologist.

3. *Suitability of the Job*—The job must not result in undue hardship, unreasonable changes in living arrangements, neglect of other responsibilities to members

of the family, exposure to hazardous conditions, or adverse effect on school progress.

F. *Refusal to Accept a Job*—Refusal by an otherwise eligible individual sixteen years of age and over to accept a work opportunity available to him under the conditions specified above renders him ineligible for assistance. If such an individual is a husband or parent living in the home, the wife or children are ineligible also.

Since denial or termination of assistance can result in grave hardship, such action should be taken only after careful exploration and an explanation to the individual of the consequences of his decision. For requirements with respect to provisions of child care services, see Bul. 493, 10–15–69.

Income from employment shall be verified, if possible, by written evidence, such as income tax withholding forms or pay envelopes. If wages fluctuate, pay envelopes for a period of several months will be necessary. If written evidence is not available, contact with the employer, with the client's consent, may be necessary. If the employment is of a seasonable or intermittent nature, it may be possible only to verify by the agency's knowledge of prevailing rates in the community. In this event, the record should reflect this information.

The initial contention of plaintiffs, sustained by the Court in its order and memorandum of April 22, 1971, 325 F. Supp. 1162 (E.D.Va.1971) was that the Work Rule was inconsistent with and interfered with the Congressional design of the WIN program.

Upon the evidence before it, the Court found numerous conflicts between WIN and the work rule, to-wit:

1. The Work Rule was applied to those AFDC recipients found "inappropriate" under state standards for the WIN program. Thus AFDC recipients who were, under Congressional standards, exempt from WIN were exposed to further coercion under the Work Rule. The Court's conclusion with respect thereto was as follows:

> In any event, the defendants concede, as stated, that § 211.4E and F have no impact on WIN enrollees. This position is correct legally, for Congress certainly cannot have intended that those in WIN programs be subject to precipitous termination of their training activities or preparation for employment whenever the welfare agency located "suitable" employment. Such a frustration of the federal program would occur if the WIN and work rule provisions applied at the same time to the same people. The rights to testing, counseling, and employability plan granted by federal law, and the rights to participate in training programs established under the act would be nullified. Moreover, the right to be subjected only to the sanction of denial of benefits attributable to the single individual who declines to participate, after a hearing and review conducted by the manpower agency, would be denied. When a state rule otherwise would nullify rights granted by federal law and stymie the operation of a federal program, it must yield. Cf. Colorado Anti-Discrimination Commission v. Continental Airlines, 372 U.S. 714 [, 83 S.Ct. 1022, 10 L.Ed.2d 84] (1963).

The decision that the federal scheme ousted any state power to enforce a regulation governing acceptance of employment by WIN participants necessarily leads to the conclusion that those found inappropriate for WIN are also immune from such a rule; for to hold to the contrary would frustrate still another aspect of the federal scheme. The WIN statute and regulations provide that, despite a finding of inappropriateness under the state's standards, a welfare recipient may volunteer for the program, and that such applicants must be promptly referred and enrolled. Referral may be denied a volunteer only on grounds

related to the health of the family structure. It is no justification for non-referral, for example, that child care is not currently sufficient or that the individual is too remote from the site of a WIN project, in the opinion of welfare officials.

Once enrolled, the volunteer is at liberty to withdraw, too, without fear of the sanctions which apply to compulsorily referred persons.

If the defendants were right in contending that the Virginia work rule does not cover WIN participants but that it may nonetheless be applied to those found inappropriate by the local welfare departments, an illogical situation would exist; for it would then be a simple matter to avoid the effect of the state rule. Those found inappropriate could simply request referral to the work incentive program in order to obtain the benefits of its protection. This is consistent with the apparent statutory purpose; for if Congress's plan to define and limit the sanctions applicable to those referred as appropriate for WIN precludes overlapping state requirements with broader sanctions, it is inconceivable that such a state rule should apply to persons whom Congress decided should be subject to no penalties at all.

2. Under the Work Rule the sanction for noncompliance was termination of benefits to the entire AFDC family unit (WIN provided for termination only of the individual's benefits).

3. The procedures for termination under the Work Rule were loose, vague and often arbitrary. Such was the case particularly with respect to termination of benefits of the named plaintiffs.

Based upon the foregoing, the Court concluded that:

The Court is not ruling that individuals receiving welfare assistance are under no obligation to accept employment. Indeed, the Court's holding is based upon the compulsory work provisions in the federal legislation, and it is confined to stating that where Congress has fixed the terms and extent of sanctions for failure to accept employment, a state regulation imposing different and additional sanctions cannot coexist.

The Court's order of April 22, 1971, accordingly provided *inter alia* that:

The defendants, their successors, officers, agents, servants, employees and attorneys, and all persons in active concert or participation with them receiving actual notice of this order shall cease to enforce or implement the regulation formerly embodied in § 221.4 E and F of the Virginia Manual of Procedure for Local Welfare Departments, or that currently embodied in § 305.4 A & B thereof, or any regulation substantially similar to those provisions against members of the plaintiff class. 325 F.Supp. 1162.

On March 7, 1972, the United States Court of Appeals for the Fourth Circuit affirmed the decision and order of this Court. 456 F.2d 652 (4th Cir. 1972). The defendants have filed a Petition for Certiorari in the United States Supreme Court, which was denied 409 U.S. 885, 93 S.Ct. 112, 34 L.Ed.2d 141 (1972).

On August 29, 1972, defendants promulgated Manual Transmittal #39, which contains what is hereinafter referred to as the New Work Rule, without prior submission of same to this Court. Plaintiffs contend that the New Work Rule is, for several reasons averred, violative of the Court's order of April 21, 1971, and seek in effect an injunction against same and a contempt judgment.

Counsel appeared before the Court pursuant to plaintiffs' contempt motion and defendants' cross motion for summary judgment on November 8, 1972, at which time oral argument was heard and this matter taken under advisement pending submission of further memoranda from counsel. Counsel also agreed that the effect of the New Work Rule would be stayed pending this action, and that defendants would make an effort to

rectify the effects of the New Work Rule upon recipients so affected prior to the November 8th hearing and report on same to the Court. Counsel have now filed their respective memoranda, and it is upon same and oral argument that the Court finds this matter ripe for disposition.

The Court will consider first the validity of the New Work Rule before passing on the contempt motion.

2. "Senate Bill 84," is the popular name for an amendment to Title 63.1 of the Virginia Code, passed by the Virginia General Assembly on April 10, 1972. The section is an enabling act pursuant to which the regulations here in question were promulgated. The legislation provides as follows:

Be it enacted by the General Assembly of Virginia:

1. That Title 63.1 of the Code of Virginia be amended by adding a chapter numbered 6.1 containing Sections 63.1–133.2 through 63.1–133.6 as follows: Section 63.1–133.2. The local board of public welfare and superintendent of public welfare of each county or city are charged with the duty of attempting to locate reasonable employment opportunities for persons who are receiving public assistance. A "reasonable employment opportunity" is defined as a job opportunity not beyond the physical and intellectual capabilities of the individual and is not unreasonably disruptive of the duties owed his or her family, offers an opportunity to such person to become partially or wholly self-supporting, and provides reasonable compensation, which will aid in restoring the economic well-being of the persons so employed as well as the economy of the political subdivision in which such recipient would be otherwise entitled to receive public assistance. The board and superintendent shall utilize, where available, the resources of the Virginia Employment Commission in securing such employment opportunities and the latter agency shall cooperate with the board and superintendent in developing such programs as are necessary for accomplishing the purposes of this chapter. Such efforts shall be in addition to those required under the provisions of Public Law 92–223, it being the purpose of this chapter to utilize all available state and federal resources to assist needy persons in attaining economic independence.

*New Work Rule*

The Manual of Policy and Procedure amendment in question provides *inter alia* as follows:

Senate Bill 84,[2] enacted by the General Assembly at its 1972 session, added a chapter to Title 63.1, Code of Virginia, placing upon local welfare departments the responsibility for assisting public assistance recipients to locate reasonable employment opportu-

Section 63.1–133.3. Every person in a county or city shall have the right to file with the Department of Public Welfare specific, bona fide offers of employment which shall include the qualifications required of persons to apply for such employment, the hours of work expected, and the compensation offered therefor, if known. The Department shall refer, aid and assist appropriate recipients to prospective employers and to any State, federal or private agency engaged in providing job opportunities or training.

Section 63.1–133.4 (deleted).

Section 63.1–133.5. (a) The department shall review the records of recipients of public assistance in order to make job referrals current with employment needs. The superintendent shall at least quarterly, report to the board of public welfare relating to the jobs offered, persons referred or such other information as the board may request.

(b) If the local board determines that a recipient of public assistance appears unreasonably to have failed to seek or refused to accept a reasonable employment opportunity after such has been made available, such determination shall not operate automatically to terminate the grant of public assistance to such person; provided, however, that in any such case the local superintendent or board shall notify the recipient that a hearing will be held at a time certain, not sooner then ten days thereafter, to determine whether his public assistance grant should be terminated on account of such probable failure or refusal. Upon a finding at the hearing pursuant to such notice of failure to seek or refusal to accept, without good cause, a reasonable employment opportunity the local department or board may reduce or terminate the public assistance otherwise payable. In determining whether public assistance will be reduced or eliminated, the local depart-

nities within their capacity to perform. In carrying out this responsibility, the local department is required to accept and place on file bona fide job offers received from the community and to refer appropriate recipients to prospective employers, in addition to using the resources of the Virginia Employment Commission and any other agency offering employment or training opportunities. Attachment 1 to this Transmittal is a copy of the legislation.

The new legislation specifically states that its provisions are to be implemented *in addition to* those required under the 1971 "Talmadge" amendments to the Social Security Act which provide for expansion of the Work Incentive Program and the registration with the Virginia Employment Commission of all ADC recipients found appropriate for employment who are not so remote from a WIN project as to be unable to participate effectively.

The Attorney General has rendered the opinion that the Talmadge Amendments clearly manifest the intent of Congress that a state be allowed to enact its own work programs in addition to those of the federal government. Such programs may not be applicable, however, to persons specifically exempted under the federal statute.

With these exemptions, the Attorney General finds that Senate Bill 84 should be implemented.

The attached Manual material sets forth the new provisions with respect to employment which are summarized as follows:

1. *Work Registration Requirement* (305.4 A. and B.)

All applicants for and recipients of financial assistance (not the category-related medically needy) are required, as a condition of eligibility, to register with the Virginia Employment Commission for employment or training, with the exception of the following:

a. Those over 65 (The eligible OAA applicant/recipient is exempt, but an EWB person under 65 is required to register unless otherwise exempt).

b. A child under 16 or between the ages of 16 and 21 and attending school *full time* (i. e., at least 6 hours a day).

c. Those who are ill or incapacitated, physically or mentally, for employment (The eligible APTD applicant/recipient is exempt, but an EWB person is required to register unless otherwise exempt.

d. The mother, or other caretaker, of a child under six.

ment or board shall take into consideration the compensation which such job opportunity offered but the reduction or elimination, as the case may be, need not be proportionate to the compensation which such job would otherwise provide. The Director shall promulgate such rules as may reasonably be necessary to assure that such hearings as may be conducted under this chapter shall be conducted in such a manner as to effectuate the purposes of this chapter. A copy of such rules shall be furnished every recipient who is given the notice of hearing required by this chapter. Any board or department holding a hearing under this chapter shall comply with such rules.
(c) No determination pursuant to (a)

above nor reduction or elimination pursuant to (b), above shall be made with regard to any person who is physically or mentally incapable of engaging in regular employment or who is blind or less than eighteen or more than sixty-five years of age.
Section 63.1–133.6. The local superintendent or board of public welfare shall report to the governing body of the political subdivision in which public assistance grants are made, at such intervals as the governing body may specify, the number of job openings which have been located and refused or accepted as the case may be, and the number of reductions or eliminations of public assistance payments made pursuant to this chapter.

e. A person caring for another member of the household who is ill or incapacitated.

As under the WIN program, any person exempted who wishes to volunteer for work or training should be given the opportunity to register. District offices of the Virginia Employment Commission will be working cooperatively with the local departments in interviewing registrants to appraise their job potentialities and in making referrals to appropriate employment and training opportunities. One Work Registration Record form, VEC/DW&I/FS–1, will be used for registration of persons who will be enrolled in the WIN program as well as those who will not; the same form will be used for public assistance recipients who are applying for or receiving Food Stamps. (For Food Stamps Only, i. e., non-assistance persons, Form FNS–284 will continue to be used for work registration.)

2. *Services to be Provided* (305.4 C.)

Each individual found appropriate for employment or training is to be referred to the services staff. Supportive services needed to enable the individual to pursue job opportunities and to participate in employment or training are described in Bulletin #544 which is being issued at this time.

\* \* \* \* \* \*

4. *Action upon Refusal to Register or to Accept a Reasonable Employment or Training Opportunity* (305.4 E)

Those agencies in which the WIN program is in operation are to follow specific policies prescribed under the Talmadge Amendments [see Court's discussion *infra*] for ADC cases.

In the WIN agencies for the other categories and in the non-WIN areas in all categories, comparable policies have been established which are as follows:

a. *When an applicant (or a recipient at the time of review) is found appropriate for employment or training and refuses, without good cause, to register,* he is ineligible for assistance. A nonexempt person who is EWB is not to be included in the grant if he refuses to register. In ADC, if the only eligible child is not exempt and refuses to register, the case is ineligible. Refusal by the caretaker to register does not affect the eligibility of the children.

b. *When a recipient refuses, without good cause, to accept a reasonable opportunity for employment or training,* he is no longer eligible and is to be removed from the assistance unit. Counseling services should continue to be made available to the individual.

c. *Prior notice of proposed action to reduce or cancel the assistance payment* is to be sent at least 15 days before such action is to be taken in accordance with the provisions of Section 701.2 D. (pages 4 and 5). The new legislation requires, however, that a specific date (no sooner than 10 days following the notice) be set for a hearing to determine whether or not action is to be taken as a result of the recipient's refusal to register or accept employment.

Although the law implies that the hearing is to be held before the local board, it is assumed that the board may delegate this responsibility to the superintendent.

The Advance Notice of Proposed Action, Form Va. DW&I–PA–18, in such cases should be accompanied by a letter to the recipient stating that an appointment has been made for him to meet with the board or superintendent on a specific date, between 10 and 15 days after the date of the notice, to explain his reasons for refusal to register or

accept employment. The letter should advise him to notify the agency if he is unable to appear at that time or if he needs help with transportation.

If the individual does not appear for the appointment or advise the agency of reasons why he cannot do so, the proposed action is to be taken unless an appeal is filed within the 15 day period. In such a situation, assistance is to be continued at no less than the original amount pending the appeal decision, since the issue of "good cause" is one of judgment.

Plaintiffs contend and the Court concurs that the aforestated New Work Rule is violative of the Court's Order of April 22d in that (1) any state work rule is "substantially similar" to the old work rule enjoined, and (2) The New Work Rule itself is "substantially similar." The defendants contend that the New Work Rule is properly authorized by amendments to the Social Security Act, Public Law 92–223, 42 U.S.C. § 602(a)(19)(G) and 42 U.S.C. § 603(c) and (d), known as the Talmadge Amendments and Senate Bill 84, *supra.*

■ The Court has considered the Talmadge Amendments and concludes that they are in no manner supportive of defendants' position. Under the new amendments states are required to register for pre-WIN services all AFDC recipients not excluded and to certify to WIN those appropriate. Supportive services are also provided for AFDC recipients prior to certification. 42 U.S.C. § 602(a)(19)(G). Federal participation is also increased from 80 to 90 percent, 42 U.S.C. § 603(d), and penalties provided against states for failing to pre-

pare at least 15% of those registered under the Social Security Act, § 402(a)(19)(A) for WIN. 42 U.S.C. § 603(c). Further, legislative history reveals that the Congress intended by the Talmadge Amendments to strengthen the WIN program. There is no indication whatsoever that the intent thereby was to allow for similar state programs.[3] See 1971 U.S.Code Congressional and Administrative News, Vol. 2 at p. 2436 et seq.

Having concluded that the Talmadge Amendments do not affect the design of the WIN program and congressional intent that same be exclusive, the Court must accordingly consider whether the New Work Rule is violative of the principles enunciated supra and in its prior April 22, 1971 memorandum, 325 F. Supp. 1162.

■ The New Work Rule does offer improvements over objectional sections of the former Work Rule.[4] For example, sanctions for noncompliance are applied only to the recalcitrant recipient rather than to the whole family unit. More counseling is provided and advance notice of a hearing prior to termination is provided. These improvements do not, however, change the effect of the work rule upon the general WIN scheme: AFDC recipients not in WIN are still liable to termination though exempt from the coercion of the federal compulsory work program. As such, the New Work Rule runs afoul of the principles applicable herein as determined in this Court's prior opinion and the opinion of the Court of Appeals, which stated, *inter alia:*

> Appellants maintain that the Virginia Work Rule applies basically to those individuals deemed "inappropriate"

---

3. Language quoted in the defendants' brief is taken from a portion of the Act not amended by the Talmadge Amendments. The Court will not respond to what is effectively a rehash of argument before the Court at a prior time. The Court also notes that counsel brought to the attention of the Court of Appeals for the Fourth Circuit the substance of the Talmadge Amendments by letters dated Dec. 17,

1971 and Dec. 24, 1971, received by the Court prior to issuance of its affirming decision in March of 1972. Discussion *infra.*

4. The New Work Rule and Senate Bill 84 do provide for registration of AFDC recipients prior to certification in accordance with the Talmadge Amendments. That aspect is not challenged here.

for referral to WIN. However, scrutiny of congressional records reveals that Congress did not intend that "inappropriate" persons should be compelled to work in any way. 456 F.2d at 654, note 5.

■ Accordingly, the Court concludes that the New Work Rule is violative of the preemptive effect of the WIN program. As such, it cannot be allowed to stand and is hereby declared null and void. Defendants' motion for summary judgment with regard thereto is denied; summary judgment shall be granted for plaintiffs. An order shall enter enjoining the application of the state rule to the plaintiff class.

*Contempt*

■ It is well settled that the jurisdiction of a trial court continues in effect subsequent to the entry of an injunction, and that said jurisdiction and injunction continue in effect even though new legislation may render the effects thereof void. See Yanish v. Barker, 211 F.2d 467 (9th Cir. 1954). As the Court stated in *Yanish*:

> We feel constrained to observe that, even apart from the savings clause, the appropriate procedure for appellee to pursue as a public officer would have been to move for a modification or vacation of the injunction. *It was not for him, any more than it would be for a private individual in like circumstances, to decide that an injunction order running against him had been rendered nugatory by subsequent legislation.* His course should be to obey it unless and until set aside in proceedings brought for that purpose. (citations omitted) (emphasis supplied) 211 F.2d 467, 470.

■ The defendants' asserted defense with respect to this matter is that the New Work Rule is valid and not in violation of the Court's injunction. The Court has, *supra*, determined this defense to be without merit. The defendants assumed the risk of being held in contempt when they put in effect the New Work Rule without a judicial determination that same was not violative of this Court's decree. In so doing they acted at their peril. The fact that they may have done so without intent to disobey this Court's order is of no consequence, for once a violation of an order is clearly established, intent is of no consequence in a civil contempt proceeding. See N.L.R.B. v. Ralph Printing and Lithographing Co., 433 F.2d 1058 (8th Cir. 1970); McComb v. Jacksonville Paper Co., 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1948). The Court is inclined to exercise restraint in sanctioning the defendants primarily because evidence subsequent to the violation of the Court's injunction indicates that while undoubtedly the defendants acted wilfully in disobeying and violating an injunction of this Court, it would appear from the arguments made by their counsel that such actions were taken only after consultation with counsel, which the Court deems in equity a fact to be taken into consideration. The defendants, however, are to be admonished that the force and vitality of injunctions are not dependent upon the views of those affected, regardless of from what source such views may have been attained. Other factors which cannot be ignored by the Court are defendants' assertions with respect to the Talmadge Amendments which, in the Court's opinion, border upon being specious.

In a letter to the Fourth Circuit Court of Appeals, dated December 24, 1971 (prior to that Court's affirmance), defendants' counsel cited the Talmadge Amendments as supportive of their arguments with respect to the pre-amended WIN statutes. Plaintiffs represent, and are unrebutted in that respect, that in defendants' brief to the United States Supreme Court in petition for certiorari it was stated, at page 6:

> Such amendments [Talmadge] which will be effective July 1, 1972, were presented to the Court of Appeals prior to its decision and *do not moot the key issue presented*—whether the Commonwealth has not only a right

but also a duty to insure employable recipients are gainfully employed, taking into consideration the suitability of the specific job opportunities. (Emphasis added).

Nevertheless, the Manual Transmittal # 39, *supra*, contains the statement:

The Attorney General has rendered the opinion that the Talmadge Amendments clearly manifest the intent of Congress that a state be allowed to enact its own work programs in addition to those of the federal government.

The manual is dated August 29, 1972, subsequent to the Court of Appeals affirmance of this Court's judgment. Although purporting to rely on the effect of the Talmadge Amendments, defendants' pleading styled "Memorandum in support of Answer to Motion for Contempt," at page 3, cites and quotes sections of 42 U.S.C. § 602(a)(19) *unchanged* by the amendments, in effect presenting a rehash of the former arguments.

In short, the Court concludes that defendants wilfully, and without reasonable belief in the correctness of their actions and the law, disobeyed and violated an injunction of this Court. The Court finds defendants in contempt, but for reasons heretofore stated and because of their efforts hereinafter referred to will not burden them with sanctions.

The Court notes that immediately upon joinder of the contempt issue, defendants entered upon a good faith effort to stop implementation of the New Work Rule. As a result of their efforts, defendants aver that "only one such person has been reported as having been affected by the rule." As plaintiffs correctly point out, however, the statistics "do not reflect what has happened throughout the entire state, since half of the local departments had not reported at the time the survey was prepared. Nor have there been any reports on whether the local departments' Inquiry Books (Manual § 601.4) have been checked to find out who might have been turned off, or away, by being told of the New Work Rule."

The Court will nevertheless accept defendants' efforts in mitigation of the contempt finding and in the exercise of its discretion not impose sanctions at this time.

As a final matter, plaintiffs' counsel. Neighborhood Legal Aid, a federally funded project, has prayed for an award of attorneys' fees.

The Court of Appeals for the Fourth Circuit has ruled that:

The federal rule, oft repeated, is that "attorney's fees are not ordinarily recoverable in the absence of a statute or enforceable contract providing therefor." Fleischmann Corp. v. Maier Brewing (1967) 386 U.S. 714, 717, 87 S.Ct. 1404, 1407, 18 L.Ed.2d 475 . . . To this rule, courts of equity, as *Fleischmann* adds, have established certain limited historic exceptions. These exceptions are confined to those unique and special cases involving "compelling circumstances" and "overriding considerations of justice," where to deny allowance would result in "gross injustice". Brewer v. School Board of City of Norfolk, 456 F.2d 943 (4th Cir. 1972); See Bradley v. School Board of City of Richmond, 472 F.2d 318 (4th Cir. 1972).

One said exception permits a party to recover when his adversary has engaged in misconduct or harassment by virtue of which the party seeking to recover attorneys' fees has been compelled to institute litigation. See Bell v. School Board of Powhatan County, 321 F.2d 494 (4th Cir. 1963); see also Recovery of Attorney's Fees: A New Method of Financing Legal Services, 40 Fordham L.R. 761, 767 (1972). Attorney's fees, further, are appropriate in equity when the actions of those sought to be taxed constitute "unreasonable, obdurate obstinacy, or persistent defiance of law." *Brewer, supra,* 456 F.2d at 949. In view of the Court's contempt citation, the present defendants' conduct qualifies under this standard. The

present matter, therefore, in view of the said conduct, falls within this exception.

Defendants contend, however, that as Legal Aid is federally funded, plaintiffs have suffered no costs or expenses in this matter. Plaintiffs' counsel counters that the time utilized in preparing for these contempt proceedings constitutes time taken from Legal Aid's constituency. The Court notes an additional concern—that recovery of attorneys' fees here would tax against the state and indirectly against plaintiff welfare recipients.

Case law on these issues is sparse. In Gaddis v. Wyman, 336 F.Supp. 1225 (S. D.N.Y.1972), the District Court in essence stated that it had discretion to award attorneys' fees to a legal services group against state welfare administrators but refused to exercise that discretion. Its stated reason for so doing was the failure of the Legal Aid attorneys involved to expend private funds in the course of the litigation. In Ojeda v. Hackney, 452 F.2d 947 (5th Cir. 1972), the United States Court of Appeals stated that attorneys' fees would be awarded to a private attorney against a Texas welfare administrator only from welfare monies that might be disbursed to the attorney's welfare recipient clients but not from funds appropriated solely to the Texas Welfare Department. Finally, a District Court awarded attorneys' fees to a legal services group against the Illinois State Welfare Department at the conclusion of long and apparently vexatious litigation, but said the award was made without comment upon the issues raised. Doe v. Weaver, No. 70–C–3084 (N.D.Ill., Oct. 11, 1972, Dec. 14, 1972).

From this limited precedent the Court draws several conclusions which suggest, in this Court's view, a reasonable approach to this issue.

First and obviously, the Court must determine whether the circumstances of the litigation merit attorney's fees under doctrines of equity as it would apply to *private* attorneys and parties. That requirement is met for the present matter under the principles of *Brewer, Bradley* and *Bell, supra.*

Second, the exercise of that discretion must be viewed in terms of the potential recipient of an award. The *Gaddis* court appears to indicate that a compensatory award is not merited when the legal services expended are already provided for by public funding. That conclusion impliedly makes short shrift of the Neighborhood Legal Aid's argument here that the time utilized in prosecuting the present motions resulted in denial of services in kind to other Legal Aid constituents. While the Court finds support for this contention in the fact —of which judicial notice is taken—that Neighborhood Legal Aid presently maintains waiting lists of clients desiring legal service, it nevertheless appears logical that Legal Aid's determination of how to allot its time—which is prepaid by its supporters—is an administrative decision for which an adversary should not be held accountable.[5]

While the Court concludes that attorney's fees are not merited for compensation in this case, it is nevertheless arguable that in certain circumstances public policy may mandate that in any event the burden of legal services be shifted to the losing party either upon the principle that the costs of policy enforcement should be borne by those who violate said policy or for the purpose of encouraging private litigation by freeing litigants of the necessity to pay for legal services. That argument, however, is more attractive in other legal areas, for example with respect to consumer pro-

5. Of course it would also be logical to award compensatory attorney's fees to Legal Aid's supporters who technically should have the right to allocate the award at their option either to Legal Aid or their own coffers. That process, however, raises further procedural problems of an administrative nature which render this alternative inappropriate.

tection suits under the Truth in Lending Act, 15 U.S.C. § 1640, where Congress has by statute expressed a policy of shifting the costs of litigation to violators of the Act. See Ratner v. Chemical Bank, 329 F.Supp. 270 (S.D.N.Y.1971); Jones v. Selden's Furniture Warehouse, 357 F.Supp. 886, (E.D.Va.1973). Absent express congressional intent or other strong legal indications, the Court would be reluctant to find the public policy rationale of overriding importance. In the present matter, however, the Court need not make any such finding, for such public policy factors are absent.

■ Third, the exercise of discretion to award fees must be viewed with respect to the party to be taxed. As noted, *supra*, the Court of Appeals for the Fifth Circuit in *Ojeda*, 452 F.2d 947, stated that attorneys' fees could only be recovered from monies slated for disbursement to the welfare recipient-clients, but not from nondistributable monies allocated to the budget of the State Welfare Department. That holding is, in essence, a recognition that recovery may not be ordered directly from the state treasury because of the proscription of the Eleventh Amendment, as interpreted by case law. See Herndon v. Superintendent, 351 F.Supp. 1356 (E.D. Va.1972).

■ In the present matter, the effect of the injunction, *ante*, upon disbursements to welfare recipients is unclear, and it would be difficult to determine, if the Court were so inclined, from whose welfare benefits attorneys' fees should be procured. The question is academic, however, for the Court concludes that under the circumstances attorneys' fees should not be borne even indirectly by the innocent victims of another's acts. The Court is satisfied, as well, that such was not the intended result of the motion for fees.

■ While the *Ojeda* principle would not prevent recovery of attorneys' fees from malfeasant state administrators in their personal capacity, it would

nevertheless require, in the Court's opinion, a strong showing of personal, wilfull misconduct to hold an administrator so liable in equity. No such showing has been made here.

For these reasons, plaintiffs' motion for attorneys' fees will be denied.

An order consistent with this memorandum shall issue.