FORREST CREEK ASSOCIATES,
LTD.; Stephen S. Purdue,
Plaintiff-Appellee,

v.

McLEAN SAVINGS AND LOAN ASSO-
CIATION; McLean Financial
Corporation, Defendant-Appellant,

and

Frank M. Howard, Defendant.

FORREST CREEK ASSOCIATES,
LTD.; Stephen S. Purdue,
Plaintiff-Appellant,

v.

McLEAN SAVINGS AND LOAN ASSO-
CIATION; McLean Financial Corpora-
tion; Frank M. Howard, Defendant-Ap-
pellee.

FORREST CREEK ASSOCIATES,
LTD.; Stephen S. Purdue,
Plaintiff-Appellee,

v.

McLEAN SAVINGS AND LOAN ASSO-
CIATION; McLean Financial Corpora-
tion; Frank M. Howard, Defendant-Ap-
pellant (Two Cases).

Nos. 86–1219(L), 86–1233, 86–1234
and 87–1038.

United States Court of Appeals,
Fourth Circuit.

Argued May 4, 1987.

Decided Oct. 28, 1987.

a loan to finance the conversion of an apartment complex to a condominium. The plaintiffs paid a large standby fee to reserve money they were never able to borrow. The plaintiffs believe that the fee should be returned; the defendants insist that under the terms of the commitment agreement the conditions for a refund were not met.

In their complaint the plaintiffs charge the defendants with racketeering as well as breach of contract, and each side has accused the other of fraud.[3] Counsel for the defendants have repeatedly moved for sanctions against counsel for the plaintiffs; counsel for the plaintiffs have sought to have counsel for the defendants disbarred. Each attorney has threatened his adversary with criminal prosecution, and each has exaggerated small errors committed by his adversary. The district court ruled: a plague on all the parties. The court dismissed all claims and counterclaims with prejudice. We affirm.

John E. Harrison, McLean, Va., and Harvey B. Cohen, Arlington, Va., for MSL et al.

William G. Schaffer, Alexandria, Va., for Forrest Creek et al.

Before WINTER, Chief Judge, CHAPMAN, Circuit Judge, and WISDOM, United States Senior Circuit Judge for the Fifth Circuit, sitting by designation.

WISDOM, Senior Circuit Judge:

The essence of this case is a dispute over a loan commitment contract to provide financing for a real estate transaction. The plaintiffs[1] approached the defendants[2] for

I.

In 1983 Ross Provenzano and Stephen Purdue decided to buy the Chatham Creek apartment complex in Marietta, Georgia. Acting on behalf of a group that eventually became the Forrest Creek Associates, Provenzano and Purdue planned to renovate the complex and turn the apartments into a condominium of 223 units which would then be resold separately. From the beginning, Forrest Creek planned to offer "100 percent financing" so that the individual units could be sold quickly and profitably to investors who would supposedly derive tax benefits from owning them.

In January 1984, after examining the basic Forrest Creek proposal, the McLean Savings & Loan of Virginia offered to finance about half of the $22 million project.

---

**1.** The plaintiffs are Forrest Creek Associates, Ltd. ("Forrest Creek"), a California limited partnership, and Stephen S. Purdue, a California resident.

**2.** The defendants are McLean Savings & Loan Association ("MSL"), McLean Financial Corporation ("MFC"), and its president, Frank M. Howard.

**3.** In their first complaint the plaintiffs also alleged that the defendants' conduct was "negligence per se" and a "prima facie tort". These claims were dismissed by the district court on January 17, 1986.

While this offer was pending, Forrest Creek learned that a subsidiary of MSL, the McLean Financial Corporation, might be willing to fund the entire project. The MSL offer was set aside, and Provenzano and Purdue began negotiating a loan commitment with MFC.

Acting on the advice of counsel, Purdue formed a shell corporation, Stewart National Mortgage of Georgia (Stewart), to serve as an intermediary between Forrest Creek and MFC. Once the loans were approved, MFC would lend to Stewart, and Stewart would then lend to the individual buyers.[4] Although MFC planned to sell the mortgages either to MSL or to private lenders on the open market, the loan commitment from MFC to Stewart required that the mortgages conform to Federal National Mortgage Association (FNMA) standards to insure their marketability.

In particular, as both sides now agree, FNMA guidelines proscribe "100 percent financing". An early draft of the loan commitment sought to enforce this standard by flatly prohibiting all secondary financing. Such a restriction threatened to interfere with Forrest Creek's established plan to offer special incentives that would amount to 100 percent financing, and the final commitment was redrafted to allow secondary financing if the buyer certified that at least ten percent of the purchase price had been paid in cash from the buyer's unencumbered funds. Provenzano and Purdue apparently believed that this language permitted them to repay individual investors for their cash outlays as long as repayment came *after* the closing of the

mortgage and did not encumber the investors' required ten percent equity in the project.[5] MFC maintains that the seller incentives would cause the loans not to conform to FNMA requirements and that the seller incentive plan was never presented in written form to MFC for its review and approval.

On March 5, 1984, MFC formally offered to provide $21,970,000 in loans for the purchase, rehabilitation, and conversion of the Forrest Creek project. A separate provision of the agreement required Stewart to pay $329,550 to MFC as a "standby fee". The same provision warned that:

> Such standby fee shall be non-refundable unless within thirty (30) days from the date of acceptance of this commitment, any and all documentation required for FNMA approval of the Project together with all documentation required [by] Exhibit A attached hereto ... is received fully and completely by [MFC].

Exhibit A lists twenty one specific areas of required documentation relating to the condominium conversion, the land and improvements, title, leases, and "such other documents as may be required ... in connection with a specific project". On March 8, 1984, on advice of counsel, Purdue signed the MFC Adjustable Rate Mortgage Real Estate Commitment on behalf of Stewart and paid the standby fee of $329,-550.[6] MFC purchased a $10 million forward commitment from FNMA to help cover MFC's purchase of loans in the project from Stewart. This cost $50,000.

---

**4.** The parties agreed that funding would take place only when a buyer had been found for each of the housing units. The buyers were to use their loan proceeds to pay Forrest Creek, and Forrest Creek would use the money to buy the apartment complex from the previous owners. The borrowing, the purchase of the complex, the conversion to condominiums, and the resale to individual investors were all supposed to occur simultaneously.

**5.** The details of the "buyer incentive" plan changed over time; the trial testimony indicates that Provenzano and Purdue wavered between offering buyers a cash rebate (a "decoration allowance") and offering them a non-recourse loan. MFC never approved any particular ar-

rangement, but the district court found, and we agree, that MFC was aware of Forrest Creek's intention to offer "buyer incentives" from the very beginning. On March 1, 1984, Provenzano told MFC officials about his tentative plan to offer additional financing to the condominium buyers after their mortgages closed. According to Provenzano, MFC "didn't care ... what took place after the closing". While these preliminary negotiations do not affect our reading of the loan commitment agreement, they are relevant to the defendants' counterclaim for fraud, discussed below.

**6.** Provenzano signed a similar agreement with Stewart on behalf of Forrest Creek.

According to the complaint, by March 9, 1984, Provenzano and Purdue had delivered only a "majority" of the required documents; the only documents that had not been delivered seemed inapplicable or unnecessary. On several occasions the two would-be borrowers anxiously asked if MFC was satisfied with the documentation. They received no answer until March 28.

In the March 28 letter Frank Howard, MFC president, notified Purdue that twenty-four items of required documentation were "still outstanding". The March 28 list included documents that had not been specifically mentioned in Exhibit A. The letter gave Provenzano and Purdue thirty days to comply, but they were also told that "the documentation required herein is not an exclusive list" and "new documentation or information ... may be required as a result of receiving the documents submitted".

According to their testimony at trial, Provenzano and his associates made heroic efforts to supply MFC with the requested documentation. Nevertheless, MFC remained unsatisfied. On May 23, Howard informed Purdue that the standby fee was no longer refundable. Over the next two months Provenzano and Purdue continued to deliver documents to MFC, and MFC continued to insist that the documentation was inadequate. On July 27, Stewart formally requested that the standby fee be refunded.

The agreement conditioned funding upon the borrower's presale of 223 condominium units. The borrower obtained 100 sales contracts at most.

In November 1985, Forrest Creek and Purdue (as successor to Stewart) sued MSL, MFC, and Howard. Federal jurisdiction was based upon the diversity of the parties. As indicated above, the three claims that survived early dismissal were (a) breach of contract, (b) fraud, and (c) violation of 18 U.S.C. § 1962 (RICO). The defendants brought a counterclaim for

fraud on the theory that Purdue had intentionally deceived MFC when he agreed in the loan commitment to produce FNMA conforming mortgages. The case was tried without a jury. After the plaintiffs had presented their case in chief and the defendants had stipulated that they had no further evidence to present, the district court ruled, under Fed.R.Civ.P. 41(b), that neither side was entitled to relief.

The defendants have appealed both the dismissal of their counterclaim and an order of the district court requiring them to reimburse plaintiffs' counsel for expenses incurred while attending a series of *de bene esse* depositions noticed by the defendants shortly before the trial. The plaintiffs have cross-appealed the dismissal of their claims, and further argue that the trial court erred in excluding documents and witnesses designated by the plaintiffs after April 28, 1986. Finally, the defendants have filed a supplemental appeal protesting the district court's decision not to impose Rule 11 sanctions against the plaintiffs' counsel, and not to order them to show cause why they should not be held in contempt of court. These various appeals have been consolidated before this Court. We now affirm the judgment of the district court in all respects.

## II.

▪ A. We begin with the plaintiffs' claim for breach of contract. In their complaint the plaintiffs extend this claim beyond MFC's retention of the standby fee to include the defendants' subsequent failure to fund the loans. The district court found, and we agree, that the loan commitment clearly provided "that a required number of condominium unit presales were to occur" as a condition precedent to funding. It is undisputed that the required number of presales did *not* occur. The defendants, therefore, cannot be held liable for their failure to make the proposed loan to the plaintiffs.[7]

---

7. We also agree with the district court that only Purdue has standing to bring a breach of contract claim against MFC. The plaintiffs' contention that Forrest Creek was an intended third

party beneficiary of the agreement cannot be reconciled with a clause in the agreement that provides: "This Letter of Commitment ... is not intended to benefit any third-party, incidentally

 B. Whether MFC breached the contract by retaining the standby fee and therefore should return the fee, is a closer question. Here again the commitment agreement speaks for itself, and its proper interpretation is a question of law. Thus, we find that the district court was correct in excluding expert testimony proffered by the plaintiffs for the purpose of interpreting the standby fee clause. *Adalman v. Baker, Watts & Co.*, 807 F.2d 359, 367–68 (4th Cir.1986). The agreement explicitly cancels "[a]ll prior offers and negotiations", and the district court was right to disregard Provenzano's recollection that he would be required to produce only "one or two items" of documentation. Such parol evidence is irrelevant to the interpretation of an integrated contract under Virginia law. *Amos v. Coffey*, 228 Va. 88, 320 S.E.2d 335, 337 (1984); *Charles E. Russell Co. v. Carroll*, 194 Va. 699, 74 S.E.2d 685, 687–88 (1953).

 Under the terms of the commitment agreement MFC was obliged to return the standby fee if it received, within thirty days of March 8, 1984, both (a) all documentation required for FNMA approval, and (b) all documentation required by MFC's own project review standards "as set forth on Exhibit A". The evidence at trial arguably showed that while the plaintiffs may have met the first requirement, they failed to meet the second.[8]

Nevertheless, the plaintiffs contend, even if some of the documents that MFC requested were not delivered, the contract implicitly required the parties to act in good faith, and MFC asked for many doc-

uments solely to avoid refunding the commitment fee.[9] The plaintiffs point especially to the testimony of Douglas Hill, a former MFC project review specialist. Hill described a deliberate policy at MFC to "ask open-ended questions for things" so as to make it "physically impossible to get those things to us ...". With respect to the Forrest Creek project, Hill testified that "I was told to ask for as many things ... as I wanted. Whether or not it was necessary, to ask for every detail that I possibly could". This and other evidence adduced by the plaintiffs at trial suggest that MFC artificially inflated their document requirements to insure that the standby fee would never be returned.

The trial judge alluded to Hill's testimony, but followed the allusion by referring to the testimony of Catherine Fisher, a senior vice-president of MFC at the time relevant to this action. Fisher testified that MFC required numerous documents but that it always attempted to make loans and never tried to turn down a loan by making excessive document requests. The MFC's payment of $50,000 for a $10 million FNMA forward commitment to cover a portion of its commitment to Stewart is some evidence of its intention to carry out its share of the agreement. Evidently, the trial judge gave more weight to Fisher's testimony than to Hill's.

With the assistance of counsel, Stephen Purdue signed an agreement that made the standby fee non-refundable unless Stewart submitted *all* the project documentation that MFC requested. Whatever may have motivated the defendants' documentation

---

or otherwise." We refer to "the plaintiff*s*" in the·text only for the sake of simplicity.

**8.** In discussing this point the district court refers to the testimony of both Provenzano and Stuart Neiman, the Atlanta attorney who was largely responsible for producing and collecting the required documents. Significantly, the plaintiffs' brief before this Court discusses only the testimony of Mr. Provenzano. Mr. Neiman's testimony indicates that, for example, the plaintiffs failed to meet MFC's request for a certification that the draft condominium documents would not be altered before the closing. Whether or not this certification was absolutely necessary, the request was not unreasonable

and MFC was plainly authorized to make it. Moreover, unlike some of the documents listed in Exhibit A, which would have been *impossible* to produce given the timing of the deal, the requested certification was merely an inconvenience and not a logical impossibility.

**9.** The defendants do not contest the long-established existence in Virginia law of an implied duty of good faith when performance of a contract depends upon the "satisfaction" of one of the parties. *See, e.g., Carpenter v. Virginia-Carolina Chemical Co.*, 98 Va. 177, 35 S.E. 358, 360 (1900); *see generally Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1153 (D.C.Cir.1984).

requests, the district court found—and the record confirms—that the plaintiffs failed to deliver documents that the defendants had a right to ask for under the contract and that the plaintiffs *could* have produced.[10]

In sum, we have here a contract for a very large loan, negotiated by experienced businessmen represented by their attorneys. The plaintiffs failed to comply with unambiguous terms of the contract. They must be held to their bargain.

## III.

A. The plaintiffs' remaining claims may be dealt with briefly. Under Virginia law fraud must be proved by clear, cogent, and convincing evidence. *Carter v. Carter*, 223 Va. 505, 291 S.E.2d 218, 221 (1982). The district court explicitly found that the evidence presented at trial failed to meet this standard. Under Fed.R.Civ.P. 52 we are bound to accept a trial court's findings of fact unless they are clearly erroneous. *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 498, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984), *reh. den.*, 467 U.S. 1267, 104 S.Ct. 3561, 82 L.Ed.2d 863; *Pullman-Standard v. Swint*, 456 U.S. 273, 288, 102 S.Ct. 1781, 1790, 72 L.Ed.2d 66 (1982).

Although the Hill testimony supports a charge of bad faith by the defendants, considering the wording of the contract and the record as a whole, we are unable to say that the district court's findings were clearly erroneous. While the loan commitment was still pending, Hill described the Forrest Creek documentation as "unacceptable". The district court chose to discount Hill's testimony at trial, which plainly conflicted with his contemporaneous assessment of the dispute. Without the Hill testimony, the plaintiffs' evidence of fraud is virtually nonexistent.[11] Since the district court found insufficient proof that the defendants committed fraud, it correctly dismissed the plaintiffs' RICO claim as well.[12]

B. We turn now to the issues raised by the defendants. The defendants have made a prodigious effort to show that the district court erred in dismissing their counterclaim for fraud. Fed.R.Civ.P. 52 applies here as well. The district court found that MFC was aware from the outset that Provenzano and Purdue wanted to offer their customers "100 percent financing".[13] As we have noted, the terms of the draft commitment agreement were modified to accommodate this plan. While these modifications are not relevant for the purpose of interpreting the contract, they are evidence that Stephen Purdue did not sign the final commitment agreement on

10. See n. 8 above. The language of Exhibit A, which instructs the plaintiffs to produce "[s]uch other documents as may be required by [MFC]", put Provenzano and Purdue on notice that they might be required to deliver documents that were not otherwise identified in the commitment agreement. Despite the open-ended nature of the plaintiffs' obligation, we reject the plaintiffs' suggestion, *raised for the first time in this appeal,* that the contract lacked mutuality. At least some of the standby fee was spent by MFC to reserve an FNMA forward commitment that covered a portion of their commitment to Stewart; no doubt more money was spent in the document review process. There is no inherent reason why MFC could not have borne these costs, but the contract that Purdue signed in effect provided otherwise.

11. The plaintiffs contend that the district court erred in excluding from trial the exhibits and witnesses designated by the plaintiffs after April 28, 1984. The original pretrial order of January 3, 1986 was extended several times and it is indeed unclear from the record that April 28

was intended to be the final deadline. Yet we have searched the plaintiffs' briefs and argument in vain for a demonstration that this exclusion affected a material issue in the case. Under Fed.R.Evid. 103, of course, an evidentiary ruling cannot constitute reversible error unless it affects a substantial right of the party who raises the question on appeal. The trial judge apparently believed that he had seen more than enough evidence to decide this case. We agree.

12. Having failed to prove their principal "predicate act", the plaintiffs are clearly not entitled to recover from the defendants under RICO. We therefore see no reason to explore the question whether the evidence that MFC engaged in similar conduct with other borrowers showed sufficient "continuity" to constitute a "pattern" for RICO purposes under *Sedima v. Imrex Co., Inc.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985).

13. See n. 5.

March 8, 1984 with the intent of defrauding either MFC or MSL. The district court's treatment of the counterclaim is admirably succinct. We read it as a finding that the facts presented at trial failed to show that the plaintiffs acted with fraudulent intent. We cannot say that the ruling was clearly erroneous.[14]

C. The next issues deal with costs and fees. The parties were unable to resolve a dispute they had about copying costs.[15] They also disagreed about the net result of offsetting expenses incurred at various *de bene esse* depositions: eleven noticed by the defendants in Georgia, and three noticed by the plaintiffs in Texas and Pennsylvania.[16] The district court listened to these arguments and awarded the plaintiffs $2,987.75.[17]

The defendants have appealed this determination. In particular, the defendants argue that the district court abused its discretion under Local Rule 21(C) of the Eastern District of Virginia by awarding the plaintiffs an allowance for food and lodging in Atlanta. This, they contend, was "clearly unreasonable under the circumstances". We disagree. We find no evidence of abuse of discretion.

The defendants have also appealed a ruling by the district court denying their motion for Rule 11 sanctions. The defendants maintain that they were forced to spend "over a half million dollars" in legal fees because the plaintiffs' complaint misstated facts in a "scurrilous and fictitious" manner. In this Circuit, a district court's findings under Rule 11 are reviewed only for abuse of discretion. *LaRouche v. National Broadcasting Co., Inc.,* 780 F.2d 1134, 1140 (4th Cir.1986), *cert. den.,* — U.S. ——, 107 S.Ct. 79, 93 L.Ed.2d 34; *Nelson v. Piedmont Aviation, Inc.,* 750 F.2d 1234, 1238 (4th Cir.1984), *cert. den.,* 471 U.S. 1116, 105 S.Ct. 2358, 86 L.Ed.2d 259 (1985). *But cf. Robinson v. National Cash Register Co.,* 808 F.2d 1119, 1125–26 (5th Cir. 1987). We find no such abuse.

It is true, as the defendants have documented at considerable length, that the plaintiffs' pleadings contain a number of inaccuracies.[18] We do not agree, however, that the case was utterly "groundless", or that it "never existed except in the imagination of Schaffer and Labowitz", counsel for the plaintiffs. That the plaintiffs did not prevail at trial is irrelevant. Rule 11 was never meant to impose a penalty upon every plaintiff whose case is dismissed.

The district court found that the plaintiffs in this case "did make some reasonable investigation" before filing their complaint. We construe this finding as one

---

**14.** We also doubt whether MFC actually relied upon the agreement as a representation that the mortgages would conform to FNMA standards. On the contrary, this case seems to have arisen as a result of MFC's hard-nosed insistence on extensive documentation to show FNMA conformance. Furthermore, we find it difficult to believe that MFC was damaged by the Forrest Creek transaction. Surely the $330,000 standby fee more than covered the costs incurred by MFC on the Forrest Creek project—prior to this litigation.

**15.** The defendants acknowledged before the district court that they had failed to reimburse the plaintiffs for certain copying charges. The defendants estimated that they owed the plaintiffs $1,800; the plaintiffs put the figure at about $2,200. The district court seems to have agreed with the plaintiffs.

**16.** The defendants argued that the plaintiffs improperly sought to charge them for meals and lodging in Atlanta without previously having filed a motion for expenses with the court. The plaintiffs responded by pointing out that the defendants were seeking first class train fare to Philadelphia, rather than coach fare as prescribed by the local rules of the district.

**17.** This amount includes $2,229.50 for copying costs and $758.25 in net deposition costs.

**18.** Perhaps the most embarrassing are the misspelled and sometimes non-existent "victims" that are listed in the plaintiffs' More Definite Statement of their RICO claim. Clearly neither "Thomas Seller" nor John Tomasello had a claim against MFC that could possibly constitute a predicate RICO offense. On the other hand, the defendants' suggestion at oral argument that only *one* similar case is pending against them can hardly be accepted. Indeed, sources included in the Joint Appendix by the defendants indicate that as many as ten or twelve similar lawsuits have been filed against MFC. The plaintiffs' RICO claim was poorly presented, but it was arguably not without merit.

that the district court made after having "examine[d] the actions at issue according to a standard of objective reasonableness", focusing on whether "a reasonable attorney in like circumstances could believe his actions to be factually and legally justified".[19] Rule 11 punishes the filing of a "pleading, motion, or other paper" that a reasonable attorney would recognize as frivolous. *See Stevens v. Lawyers Mutual Liability Insurance Co. of North Carolina*, 789 F.2d 1056, 1060 (4th Cir.1986); *Chu by Chu v. Griffith*, 771 F.2d 79, 81 (4th Cir.1985). It does not extend to isolated factual errors, committed in good faith, so long as the pleading as a whole remains "well grounded in fact". Fed.R.Civ.P. 11. The district court's denial of the defendants' motion for sanctions is affirmed.

D. Finally, the defendants ask us to reverse the district court's decision not to institute civil contempt proceedings against the plaintiffs' counsel. The defendants assert that Mr. Labowitz, one of the plaintiffs' counsel, violated a protective order by discussing the case with counsel for the plaintiffs in other lawsuits against MFC.[20] Here again, we review only for abuse of discretion, and we note that when a district court has declined to pursue civil contempt proceedings, appellate review should be "narrowly circumscribed". *Cf. MAC Corp. of America v. Williams Patent Crusher & Pulverizer Co.*, 767 F.2d 882, 884 (Fed.Cir. 1985).

■ The defendants argue that, by finding no intentional violation of the protective order, the district court implicitly applied the wrong legal standard to the issue. We disagree. It is true, as the defendants point out, that an unintentional violation of a protective order may lead to sanctions. But the very cases cited by the defendants also suggest that it is appropriate for a district court to consider the willfulness of the violation when deciding how to proceed. *See, e.g., Quinter v. Volkswagen of Amer-*

*ica*, 676 F.2d 969, 974 (3d Cir.1982); *Woolfolk v. Brown*, 358 F.Supp. 524, 534 (E.D. Va.1973). The district court clearly did exactly this, and we find no abuse of discretion.

The judgment is AFFIRMED.

---

19. *Cabell v. Petty,* 810 F.2d 463, 466 (4th Cir. 1987).

20. Apparently Mr. Labowitz also mailed out copies of an expert's report on the ability of MFC to meet its aggregate loan commitments.

Although this report was not directly covered by the protective order, the defendants contend that it made reference to other documents that *were* covered by the order.