Leroy THOMPSON

v.

Robert L. JOHNSON, (Supt.), et al.

Civ. A. No. 74–1489.

United States District Court,
E. D. Pennsylvania.

April 8, 1976.

---

Professor Ralph S. Spritzer, Mark Wilcox, Student Atty., Indigent Prisoner Litigation Program, Philadelphia, Pa., for plaintiff.

Axel A. Shield, II, Deputy Atty. Gen., Philadelphia, Pa., for defendants.

## SUR PLEADINGS AND PROOF

LUONGO, District Judge.

This matter is before me on the application of Leroy Thompson to hold Ronald Marks, Julius Cuyler and Charles Batdorf in contempt of a Consent Order entered December 3, 1974, and seeking an award of damages against each. Hearing was held on the application on May 19, 1975.[1]  From pleadings and proof, I make the following

## FINDINGS OF FACT

1. Plaintiff, Leroy Thompson, was an inmate at the State Correctional Institution at Graterford (hereinafter Graterford) from July 13, 1973 until March 11, 1975, on which date he was transferred to the State Correctional Institution at Dallas (hereinafter Dallas).  Thompson was returned to Graterford on April 18, 1975, and remained there until the date of the hearing.

2. On July 11, 1974, Thompson filed suit claiming, *inter alia,* interference with his mail.  Pursuant to the recommendation of Magistrate Richard A. Powers, III, leave was granted to Thompson to proceed in *forma pauperis,* limited to the single claim of mail interference.  Under Local Rule 9½, student counsel, under the supervision of a practicing attorney, were appointed to represent Thompson.

3. Bureau of Correction Administrative Directive No. 803, effective Septem-

---

1. Some part of the delay since the hearing is attributable to the efforts of counsel, at the court's suggestion, to attempt to resolve the matter amicably.  Plaintiff's counsel advised the court, by letter dated August 29, 1975, that the matter could not be so resolved.

ber 1, 1972 and revised March 12, 1973, provides in part:

"III. *PRIVILEGED CORRESPON-DENCE*

A. Residents shall be permitted to send sealed letters to the following persons or organizations:

1. Elected federal, state or local officials

2. Appointed federal, state or local officials

3. Staff members of these agencies

4. Lawyers

5. News Media

B.. Mail to these persons shall not be opened or censored. Mail from these persons shall be delivered to the housing unit officer, opened by the addressee in his presence and checked for contraband as a precaution in the case the mail is not from whom it is purported to be.

\* \* \*"

4. On December 3, 1974, prior to any trial on the merits of plaintiff's claim, the parties agreed to the entry of a Consent Order which provided:

"The parties to the above captioned action having agreed, in full satisfaction of the complaint herein, regarding mail interference, that the Superintendent of the State Correctional Institution at Graterford will insure that incoming 'privilege' correspondence, as defined in Bureau of Corrections Administrative Directive No. 803, addressed to plaintiff, shall be opened only by plaintiff, in the presence of his housing unit officer, in accordance with Section III.B of such directive and shall not be interfered with in any other way.

Now, this 3rd day of December, 1974, it is so Ordered."

5. Robert L. Johnson, the named Superintendent-defendant, was Superintendent at Graterford until July 1, 1974.

6. Ronald Marks became Acting Superintendent at Graterford July 1, 1974, and he served in that capacity until December 21, 1974. On or about December 3, 1974, Ronald Marks had actual knowledge of the Consent Order of December 3, 1974.

7. Charles Batdorf was at all times material to these proceedings, the mail room supervisor at Graterford. On or about December 3, 1974, Charles Batdorf had actual knowledge of the Consent Order.

8. Julius Cuyler became Superintendent of Graterford on December 26, 1974, and continued to serve in that capacity at the time of the hearing. Cuyler did not have actual knowledge of the Consent Order until some time in early May, 1975.

9. After the Consent Order of December 3, 1974 was entered, Marks informed Batdorf of the Order and instructed him to take care to follow it. Marks placed a copy of the Consent Order in the Institution's Court Order file. Marks did not directly inform Cuyler of the existence of the Consent Order when Cuyler succeeded him on December 26, 1974.

10. On February 19, 1975, Superintendent Cuyler received a communication from Thompson making a "formal complaint" that he had received privileged mail, a letter from the United States Department of the Treasury containing a savings bond, in an opened condition. This was Thompson's first complaint, after entry of the Consent Order, that his privileged mail was being opened.

11. Upon receipt of the complaint, Cuyler caused his administrative assistant, Robert Wolfe, and the mail room supervisor, Batdorf, to investigate the complaint.

12. Batdorf and Wolfe, in memoranda dated February 21, 1975 and February 26, 1975, respectively, reported that privileged mail as defined in Bureau of Corrections Administrative Directive No. 803, did not include bonds or checks from the Treasury Department.

13. At the time of the entry of the Consent Order and at all times thereafter, Ronald Marks interpreted Adminis-

trative Directive No. 803 to include, as privileged mail, only mail from elected officials and high appointed officials and members of their staffs.

14. Prior to March 24, 1975, Cuyler and Batdorf interpreted Administrative Directive No. 803 to include as privileged mail, only mail from elected officials and high appointed officials and members of their staffs.

15. The interpretation by Marks, Batdorf and Cuyler was a reasonable and good faith interpretation of Administrative Directive 803 prior to March 24, 1975.

16. On March 24, 1975, Ruth Simon, Assistant Attorney General for Eastern Pennsylvania, advised Cuyler that all mail from governmental agencies fell within Directive 803's definition of privileged correspondence.

17. After being so informed, Superintendent Cuyler promptly notified the major of the guards, the business manager, the two deputy superintendents, Wolfe, Batdorf, and other prison staff members of the expanded interpretation that privileged mail included all mail from governmental agencies.

18. Prior to March 24, 1975, the inmates' mail was sorted in such a manner that the privileged mail was separated from the non-privileged mail prior to any further sorting. All non-privileged mail was then opened and inspected for contraband. Privileged mail was broken down by block and inmate number and was placed in an envelope and delivered to the block with the non-privileged mail where it was to be opened by the inmate in the presence of an officer.

19. After March 24, 1975 a new system of mail opening and distribution was adopted and was still in effect at the time of the hearing. Under the new system, all inmate mail is first sorted by inmate number, and then further sorted according to the cell block in which the inmate is housed. Inmate mail is handled three times before any mail is opened, greatly reducing the probabilities of the accidental opening of privi-

leged mail. Since the new system has been in effect, the number of pieces of privileged mail opened not in the presence of the inmate addressee has been *de minimis.*

20. Both prior to and after March 24, 1975, mail room employees were instructed to write "Opened by Mistake" and to initial the envelopes of any privileged mail which they accidentally opened in the mail room. None of the privileged mail Thompson claims to have received in an opened condition bears such notation. A letter from Temple University Law Center (P–15) was delivered to plaintiff at Dallas with the notation on the envelope (apparently written by someone at Dallas):

"Note: This envelope arrived at the Dallas Mail Room by van. This envelope was opened at the Graterford Mail Room and not the Dallas Mail Room."

21. Superintendent Cuyler did not become aware of the existence of the Consent Order until the early part of May 1975. There were no violations of the Consent Order between the date on which he learned of its existence and the date of hearing.

22. On May 8, 1975, Superintendent Cuyler sent the following memorandum to all affected personnel at Graterford:

"Effective Monday, May 12, 1975, the mail room personnel will log all legal mail for inmates in a logbook. This legal mail will not be opened. The mail room personnel will call the respective block and have the inmate sent to the mail room with a pass to pick up his legal mail. This inmate must have an ID card or be positively identified. The inmate will sign the logbook as a receipt of the legal mail being unopened and received. The inmate will open this mail in the presence of the mail room officer for inspection."

23. Incoming mail at Graterford from December 3, 1974 until April 30, 1975 averaged between 2,300 and 2,700 letters each delivery day. From the inception

of the logbook for legal mail until the date of the hearing, an average of 100 pieces of legal mail were received each day of delivery.

24. After the date of the Consent Order, the following pieces of mail were delivered to Thompson in an allegedly opened condition:

| Exhibit No. | Date Received | Return Address on Envelope |
|---|---|---|
| P–6 | Dec. 5, 1974 | U.S. Postal Service Postal Inspector in Charge Philadelphia, Pennsylvania Official Business |
| P–7 | Jan. 16, 1975 | Internal Revenue Service Official Business |
| P–8 | Jan. 28, 1975 | Office of the Clerk United States District Court Philadelphia, Pa. 19107 Official Business |
| P–9 | Feb. 6, 1975 | Department of the Treasury Bureau of the Public Debt Parkersburg, West Virginia 26101 Official Business |
| P–10 | Feb. 26, 1975 | Commonwealth of Pennsylvania Department of Education Box 911, Harrisburg, Pa. 17126 |
| P–11 | Feb. 26, 1975 | Office of the Clerk United States District Court Philadelphia, Pa. 19107 Official Business |
| P–12 | Feb. 28, 1975 | Office of the Clerk United States District Court Philadelphia, Pa. 19107 Official Business |
| P–13 | March 6, 1975 | Department of the Treasury Bureau of the Public Debt P.O. Box 509 Parkersburg, W. Va. 26101 Official Business |
| P–14 | March 6, 1975 | Office of the Clerk United States District Court Philadelphia, Pa. 19107 Official Business |
| P–15 | March 11, 1975 | Temple University Philadelphia, Pennsylvania 19122 Joseph Tilghman 614 Temple Law Center Phila., Pa. 19122 |
| P–16 | April 28, 1975 | Department of the Treasury Bureau of the Public Debt P.O. Box 509 Parkersburg, W. Va. 26101 Official Business |

25. Neither Marks, Cuyler nor Batdorf opened, or caused any Graterford personnel to open, Thompson's incoming privileged mail in knowing violation of the Consent Order or Directive 803.

26. Marks, Cuyler and Batdorf took reasonable steps to prevent the opening of Thompson's incoming privileged mail other than in his presence.

27. Thompson has failed to establish by a preponderance of the evidence that any Graterford personnel were in any way responsible for the alleged non-delivery of two letters, dated December 4, 1974 and January 14, 1975, from his student counsel.

28. Thompson's decision to send his outgoing mail by certified mail was not proximately caused by the fact that some of his incoming privileged mail was opened not in his presence.

29. The indigent Prisoners Litigation Program at the University of Pennsylvania Law School incurred the following expenses, of the reasonable values set forth, in their good faith effort to enforce the December 3, 1974 Consent Order:

| | |
|---|---|
| One day's wages for Administrative Assistant to Indigent Prisoner Program for court appearance on May 19, 1975 | $32.00 |
| One day's wages for Administrative Assistant for support services | 32.00 |
| Three trips to Graterford by student counsel | 19.50 |
| Witness fee for Sandor Siedel, Correctional Officer at Graterford | 26.50 |
| Postage, telephone and photocopying | 10.00 |
| Total ................ | $120.00 |

## DISCUSSION

The Consent Order of December 3, 1974 provided that the Superintendent was to "insure" that privileged correspondence, as defined in Bureau of Corrections Administrative Directive 803, would be opened only by Leroy Thompson in the presence of his housing unit officer. Thompson complains that on at least eleven occasions after the date of the Consent Order, he received privileged mail which had been opened, not in his presence. He seeks a ruling adjudging present Superintendent Cuyler, former Acting Superintendent Marks, and mail room supervisor Batdorf in contempt of the consent order because of their failure to see to it that the privileged mail was opened in his presence. He seeks an award of damages against

the respondents for the injury caused to him by their contemptuous conduct.

■ A person is liable for civil contempt if he violates a court order with *actual* notice that the order has been issued. *See United States v. Hall,* 472 F.2d 261 (5th Cir. 1972); *N. L. R. B. v. Crown Laundry and Dry Cleaners, Inc.,* 437 F.2d 290 (5th Cir. 1971); *Universal Athletic Sales Co. v. Salkeld,* 376 F.Supp. 514 (W.D.Pa.1974), *vacated,* 511 F.2d 904 (3d Cir.), *cert. denied,* 423 U.S. 863, 96 S.Ct. 122, 46 L.Ed.2d 92, 44 U.S.L.W. 3204 (1975); *Farber v. Rizzo,* 363 F.Supp. 386 (E.D.Pa.1973). It is not necessary that the person be formally served with the order, or that the violation be willful, *Farber v. Rizzo, supra,* or that there be intent to violate the court order. *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599, 604 (1949); *Woolfolk v. Brown,* 358 F.Supp. 524, 534 (E.D.Va.1973); *United States v. Ross,* 243 F.Supp. 496 (S.D.N.Y. 1965). In order for a person not a party to the proceeding to be found in contempt, he must have actual knowledge of the order, and he "must either abet the defendant, or must be legally identified with him." *Alemite Manufacturing Corp. v. Staff,* 42 F.2d 832, 833 (2d Cir. 1930), *quoted in Backo v. Local 281, Carpenters and Joiners of America,* 438 F.2d 176, 181 (2d Cir. 1970), *cert. denied,* 404 U.S. 858, 92 S.Ct. 110, 30 L.Ed.2d 99 (1971). *See also Wright v. County School Board,* 309 F.Supp. 671, 676–77 (E.D.Va.1970), *rev'd on other grounds sub nom., Wright v. Council of the City of Emporia,* 442 F.2d 570 (4th Cir. 1971), *rev'd,* 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972).

■ Of the persons Thompson seeks to have held in contempt, both Marks and Batdorf clearly had knowledge of the Consent Order at all times after it was entered. Cuyler, on the other hand, testified, and I accept his testimony as credible, that he did not become aware of the Consent Order until some time in early May 1975. The element of knowledge, therefore, is satisfied as to Marks and Batdorf from and after December 3, 1974, but as to Cuyler, the element of knowledge is present only from and after early May 1975. Marks and Cuyler, in their capacities as Acting Superintendent and Superintendent, respectively, are parties and are bound by the Order. Charles Batdorf, although not a party, meets the identity test of *Alemite Manufacturing Corp., supra,* and is also bound by the Order.

■ The element of knowledge having been established (although at different dates) as to all three of the respondents, and the status of respondents as persons bound by the Order having been established, the question remains whether the conduct of each or all warrants a finding of contempt. The fact that prohibited acts may have been done inadvertently or in good faith does not, in and of itself, preclude a finding of contempt. *Doe v. General Hospital,* 140 U.S.App.D.C. 153, 434 F.2d 427, 431 (D.C. Cir.1970); *Coca-Cola Co. v. Bisignano,* 343 F.Supp. 263 (S.D.Iowa 1972). The exercise of the power to find and to punish for contempt is, however, discretionary, and should be undertaken "with the utmost sense of responsibility and circumspection." *Glenwal Development Corp. v. Schmidt,* 356 F.Supp. 67 (D.P.R. 1972). *See* 18 U.S.C. § 401; *Class v. Norton,* 376 F.Supp. 496 (D.Conn.), *rev'd in part and aff'd in part,* 505 F.2d 123 (2d Cir. 1974); *Sullivan v. Houston Independent School District,* 333 F.Supp. 1149, 1176 (S.D.Tex.1971), *vacated on other grounds,* 475 F.2d 1071 (5th Cir.), *cert. denied,* 414 U.S. 1032, 94 S.Ct. 461, 38 L.Ed.2d 325 (1973). *Cf. Doe v. Norton,* 365 F.Supp. 65, 74 n. 14 (D.Conn. 1973), *vacated sub nom., Roe v. Norton,* 422 U.S. 391, 95 S.Ct. 2221, 45 L.Ed.2d 268 (1975).

■ There are present in this case some factors which weigh against a finding of contempt, and there are others weighing in favor. When the Consent Order was entered, Marks believed in good faith, as did Batdorf, and later Cuyler, that Directive 803 applied only to mail from the Court and from elected and high appointed public officials, not

to *all* mail from *any* government agency. That interpretation was a reasonable one. The language of the Directive is ambiguous. The format and wording suggest the inclusion of some and the exclusion of others insofar as it deals with mail from government offices. The Directive does not clearly spell out an intention to extend a blanket cover over *all* mail from *any* government office; the emphasis seems to be on elected or appointed *officials*, and the staff members of such officials. This factor weighs heavily against a finding of contempt for the opening of any mail in accordance with that interpretation.

■ On the other hand, Marks was to some degree at fault for failing to advise his successor Cuyler specifically of the Consent Order. Had Cuyler known of the Consent Order when he took over in December 1974, he might conceivably have taken steps that would have avoided one or more of the violations which occurred after he took over as Superintendent. This points toward a finding of contempt against Marks. However, there is no evidence indicating what, if anything, Cuyler would have done differently about the handling of the mail if he had known of the Consent Order. The Consent Order provided no hint that Directive 803 was being too narrowly interpreted. Thompson's complaint of February 19, 1975 did not cause Cuyler to re-evaluate the scope of Directive 803. Clearly Marks' failure to inform Cuyler of the Consent Order had no effect on mail which Cuyler would have regarded as non-privileged before he learned of the expanded interpretation from Ruth Simon on March 24, 1975.

■ Cuyler did initiate the logging of legal mail about the time he was informed of the Consent Order, but there is nothing in the evidence to suggest a cause and effect relationship between the two. The evidence discloses that the logging of legal mail was a further refinement of the March 24 revision of the mail distribution system, and was wholly unrelated to Cuyler's learning of the existence of the Consent Order.

Reviewing the exhibits offered at the hearing, Batdorf testified that under his pre-March 24, 1975 interpretation of Directive 803, he (and his staff) would not have regarded exhibits P–7, P–9, P–10, P–13, P–15 and P–16 as privileged mail as defined in Directive 803. Since I have found that interpretation to have been reasonable until receipt of notice of the expanded interpretation, no finding of contempt will be based on complaints concerning the opening of those pieces of mail.

Prior to March 24, Batdorf would have considered as privileged mail, P–6 (letter from the U.S. Postal Service dated December 5, 1974), and P–8, P–11, P–12 and P–14 (letters from Clerk, U.S. District Court dated Respectively January 28, February 26, February 28 and March 6, 1975).

■ Batdorf included P–16 among those letters he would not have considered privileged under the pre-March 24 interpretation of Directive 803, but P–16 was received after March 24, specifically on April 28, 1976, and its opening may not be excused on that basis. The opening of P–16 is nevertheless excusable on another ground. P–16 was from the Department of the Treasury. Special care is taken in the institution to insure that money orders, checks, and bonds mailed to inmates do not get "into the main stream of the institution" where the proceeds may become available for illicit purposes. Such instruments are taken to the inmate to be endorsed and are immediately credited to his account. The added care required in the handling of money in the institution justified the belief that it was proper to open mail thought to contain such instruments even in the face of the expanded interpretation of Directive 803. No finding of contempt will be based on that mistaken, and now discontinued, practice.

■ Batdorf included P–15 among those he considered to be non-privileged mail. P–15 was, in fact, legal mail from Thompson's student counsel. The return

address on the envelope indicated that the letter was from "614 Temple Law Center, Temple University, Philadelphia, Pennsylvania 19122." Temple Law Center is the name of the Temple Law School Building at Temple University, and although the return address should have served as a warning flag, that designation alone did not give sufficiently clear notice that the envelope contained legal mail.

■■■ The violations, then, boil down to the four letters from the Clerk's Office, and a letter from the U.S. Postal Service, Postal Inspector in Charge (P–6). P–6 was delivered just two days after the Consent Order was entered. P–6 may have been mistakenly regarded by one of the mail room employees as non-privileged mail, or it may simply have been opened inadvertently. The source of the letter, coupled with the fact that it was delivered so shortly after the entry of the Order, does not warrant a finding of contempt against Marks or Batdorf (Cuyler was not yet on the scene).

■■■ There remain then, the four pieces of mail (P–8, P–11, P–12, and P–14), all from the Office of the Clerk, United States District Court, which were clearly privileged under even the narrower interpretation of Directive 803. Of all the pieces of mail which Thompson claims were opened not in his presence, these are the only ones as to which there is no conflict in interpretation, and no institutional security reason for opening (as was the case with checks and money orders). It is not at all clear that these letters from the Clerk of Court were opened before Thompson received them. None bore notations that they had been opened in the mail room. The absence of notations could mean that they were opened by mail room personnel who either intentionally or negligently failed to make the required notations; or it could mean that the letters had been opened by mail room personnel who were unaware that they had inadvertently opened privileged mail; or it could mean that the letters had been opened

by other prison personnel, such as the housing unit officers; or it could mean that the letters had not been opened at all before Thompson received them. As I stated above, I am not convinced that the letters from the Clerk of Court were opened at all, but giving Thompson the benefit of the doubt, and assuming that they were opened when he received them, I believe it most likely that the opening was inadvertent. I simply cannot believe that the mail room employees, or that the housing unit officers, opened Thompson's letters from the Clerk of Court out of idle curiosity.

I am also inclined to the finding of inadvertence because the testimony disclosed that the institution handles approximately 2,500 incoming pieces of mail (excluding packages, magazines, etc.) for prisoners on each mail delivery day. Sorting, inspecting, and selectively opening such a volume of mail, given human fallibility, may be a nearly impossible task. The precautions which the responsible personnel took to insure the proper handling of mail in accordance with Directive 803 and the Consent Order appeared reasonably designed to "insure" that privileged mail would be opened in the presence of the inmate. That they did not succeed in every instance was, I find, due to inadvertence, not to willfulness, or even to negligence. A finding of contempt based on those four instances would have to be based on the respondents' failure to take extreme measures to avoid even the inadvertent opening of privileged mail. The facts of this case do not warrant such a finding.

Although I have found no violations justifying a finding of contempt, a discussion of the nature and purpose of sanctions for contempt is nevertheless in order.

■■■ A finding of contempt would allow the imposition of sanctions "for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *United States v. United Mine Workers*, 330 U.S. 258, 303–04, 67 S.Ct. 677, 701, 91

L.Ed. 884, 918 (1947). *See also McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599, 604 (1949). A finding of contempt does not automatically require the imposition of sanctions. *Woolfolk v. Brown*, 358 F.Supp. 524, 535 (E.D.Va.1973); *Glenwal Development Corp. v. Schmidt*, 356 F.Supp. 67, 69–70 (D.P.R.1972). If a contempt, and damages resulting therefrom are found, however, the court must assess damages against the contemnor. *Yanish v. Barber*, 232 F.2d 939, 947 (9th Cir. 1956). The fine imposed must not exceed the actual damages caused the offended party by the violation of the court's order. *United States v. United Mine Workers, supra*, 330 U.S. at 304, 67 S.Ct. at 701, 91 L.Ed. at 918; *Yanish v. Barber, supra* at 944. The offended party must prove his damages by clear and convincing evidence. *Yanish v. Barber, supra* at 946; *Universal Athletic Sales Co. v. Salkeld*, 376 F.Supp. 514, 518 (W.D.Pa.1974), *vacated*, 511 F.2d 904 (3d Cir.), *cert. denied*, 423 U.S. 863, 96 S.Ct. 122, 46 L.Ed.2d 92, 44 U.S.L.W. 3204 (1975).

▆ In the instant case there is no need to assess any sanction to assure future compliance by the respondents with the Consent Order. First, plaintiff is no longer an inmate at Graterford.[2] Second, and more important, a new mail distribution system was put into effect in March 1975, and the system was further refined by Superintendent Cuyler's memorandum of May 8, 1975. Mail room supervisor Batdorf testified that since the new system has been in effect there have been no complaints of privileged mail being received opened. The new system furnishes adequate assurance that the Consent Order (and Directive 803) will be complied with in the future.

▆ In this case, had there been a finding of contempt against any of the respondents, no damages would have been awarded to Thompson. He failed to establish that he sustained any actual damages as a result of the opening of his mail. As I stated at the conclusion of the hearing, I do not consider the mental anguish which Thompson alleges he suffered as the result of the opening of his privileged mail a proper element for compensatory damages. If respondents' conduct had been deliberate and malicious, which clearly it was not, I would have considered Thompson's mental anguish in measuring a punitive assessment against the respondents. As to Thompson's claim for damages for the additional expense he incurred by sending mail by certified mail to insure its secure passage, I simply find that his decision to certify *outgoing* mail was not proximately caused by the opening of his *incoming* mail.

▆ The only remaining area for potential sanctions against respondents is compensation to Thompson and his student counsel for expenses incurred in connection with these contempt proceedings. The complainant in a contempt proceeding may recover reasonable attorney's fees necessary to secure the contemnor's compliance with the court's order and to obtain compensation for damages done. *Farber v. Rizzo*, 363 F.Supp. 386, 398 (E.D.Pa.1973). Ordinarily attorney's fees are not recoverable in the absence of a statute or enforceable contract providing therefor. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). There is an exception which "permits a party to recover when his adversary has engaged in misconduct or harassment by virtue of which the party seeking to recover attorneys' fees has been compelled to institute litigation." *Woolfolk v. Brown*, 358 F.Supp. 524, 535 (E.D.Va.1973). In addition to attorney's fees, reasonably necessary expenses may also be recovered, limited, however, to expenses necessary to prepare for the contempt hearing only, and not for the original suit. *Universal Athletic Sales Co. v. Salkeld, supra* at 518–19; *Coca-Cola Co. v. Bisignano*, 343 F.Supp. 263,

---

2. From later correspondence by plaintiff to the Court it appears that he has been transferred to Dallas.

264 (S.D.Iowa 1972). Attorney's fees may even be recoverable in instances where the court, in the exercise of its discretion, does not issue a citation of contempt for violations of the court's orders. *Class v. Norton*, 376 F.Supp. 496, 500, 502–03 (D.Conn.), *rev'd in part and aff'd in part*, 505 F.2d 123 (2d Cir. 1974).

■■■■ Thompson incurred no expenses. The Executive Director of the Indigent Prisoner Litigation Program at the University of Pennsylvania Law School has, by affidavit, detailed expenses amounting to $120.00 incurred by the Program in connection with this proceeding. Respondents object to any award for these expenses on the ground that the Indigent Prisoner Litigation Program is funded either by the University or by federal and state grants, and, therefore, the Program did not actually incur any out-of-pocket expenses. There is some support for the agreement, *Woolfolk v. Brown*, 358 F.Supp. 524, 535–36 (E.D.Va. 1973), and while I do not agree with that proposition generally, in the present case the lack of culpability on the part of any of the respondents outweighs the need to compensate the Program for whatever expenses it incurred to enforce the Consent Order.

I conclude that in a proper exercise of discretion, there should be no finding of contempt against Marks, Batdorf or Cuyler.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and of the subject matter.

2. Ronald Marks and Julius Cuyler, as parties, are persons bound by the Consent Order dated December 3, 1974.

3. Charles Batdorf, a non-party, as a person with knowledge of the Consent Order, and as a person legally identified with a party, is bound by the Consent Order.

4. Neither Marks, Cuyler, nor Batdorf opened or caused to be opened any of Leroy Thompson's mail in knowing violation of the Consent Order.

5. The opening of Thompson's mail prior to March 24, 1975, in accordance with the reasonable and good faith interpretation placed on Administrative Directive No. 803 by Marks, Cuyler and Batdorf, did not constitute a violation of the Consent Order.

6. The opening of legal mail from student counsel, not clearly labeled on the envelope as legal mail, did not constitute a violation of the Consent Order.

7. The inadvertent opening of four letters from the Office of the Clerk, United States District Court, does not warrant, in the proper exercise of the Court's discretion, a finding of contempt against respondents. Respondents have made, and continue to make, reasonable efforts to comply with the Consent Order.

8. Neither Marks, Cuyler or Batdorf are now, or have been, in contempt of the Consent Order of December 3, 1974.

9. Notwithstanding the absence of a finding of contempt, attorney's fees and expenses may be awarded to a complainant in a contempt proceeding where such fees and expenses have been incurred to secure compliance with the Court's Order. Complainant, Leroy Thompson, has incurred no attorney's fees or expenses in this action, and accordingly none will be awarded to him.

10. In light of the lack of culpability of respondents, no award will be made to reimburse the Indigent Prisoner Litigation Program, a funded program, for the $120 expenses reasonably incurred by it in the good faith effort to enforce the Consent Order.