**CBS INC., Warner Bros. Records Inc., Atlantic Recording Corporation, Elektra/Asylum/Nonesuch Records, WEA Records, B.V., Polygram Records, Inc., Sire Records Company and Quincy Jones d/b/a Quest Records, Plaintiffs,**

**v.**

**PENNSYLVANIA RECORD OUTLET, INC. and Pennsylvania Record Outlet, Inc. d/b/a the Record Outlet and/or Record Outlet, Norton Kalinsky, and George Kalinsky, Defendants.**

Civ. A. No. 84–1894.

United States District Court,
W.D. Pennsylvania.

Dec. 14, 1984.

Robert L. Byer, Eckert, Seaman, Cherin & Mellott, Pittsburgh, Pa., and Bancroft D. Haviland, Nancy L. Schultz, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for plaintiffs.

Stanley Makoroff, and Joseph F. McDonough, Pittsburgh, Pa., for defendants.

## OPINION

MANSMANN, District Judge.

This matter comes before the Court on Plaintiffs' Motion for Civil Contempt and also for findings by this Court following a hearing on the *ex parte* seizure of various infringing recordings. For the reasons and to the extent set forth below, the Plaintiffs' Motion is granted. Accordingly, in conformity with this Opinion, the Plaintiffs are awarded $57,000 as well as reasonable attorneys' fees and costs attributable to the contempt aspect of this matter.

The following Findings of Fact are the result of hearings held in connection with the Plaintiffs' Motion for Civil Contempt on September 19, 20, and 25, 1984 as well as the October 29, 1984 hearing regarding the *ex parte* seizure of infringing recordings on October 19, 1984.

## FINDINGS OF FACT

1. Plaintiffs in this action are various corporate entities which are engaged in the business of producing, manufacturing, distributing and selling sound records of which they own the United States copyrights and/or the distribution rights for the recordings at issue. Defendant Pennsylvania Record Outlet, Inc. ("Record Outlet") is a Pennsylvania corporation with seven stores engaged, *inter alia*, in the retailing

of sound recordings. Defendant Norton Kalinsky is the treasurer of Record Outlet, and his brother, Defendant George Kalinsky, is its vice-president.[1] Both brothers are involved in the day-to-day operations of Record Outlet.

2. On August 23, 1984 the parties appeared before this Court for a hearing on Plaintiffs' Motion for a Preliminary Injunction. At that time Norton Kalinsky admitted to the importing of various copyrighted recordings from Canada on behalf of Record Outlet, in violation of 17 U.S.C. § 602, which provides in pertinent part:

[i]mportation into the United States, without the authority of the owner of copyright ... of copies or phonorecords of a work that have been acquired outside the United States is an infringement of the exclusive right to distribute copies of phonorecords....

3. On that date before the Court, the parties discussed and negotiated a Consent Decree and Defendants were aware of its provisions at that time, although the final written version was not signed by parties and filed until August 31, 1984. However, as of August 23, 1984, the Defendants were enjoined from the further importation and/or sale of Plaintiffs' copyrighted recordings, and were otherwise clearly aware of the prohibitions and terms of the Consent Decree.

4. The consent decree also provided, *inter alia:*

■ (b) Within ten days hereof, defendant shall furnish to plaintiffs' attorneys a statement under oath listing by title and number of units all phonorecords made outside the United States which reproduce sound recordings covered by United States copyrights, or exclusive distribution rights under copyright, owned by any of the plaintiffs and which have been imported into the United States or acquired by defendant, all such phonorecords which have been sold by defendant, and all such phonorecords which remain in defendants' possession, together with copies of all invoices, purchase orders, customs documents, and other documentation regarding defendants' purchase and importation of those phonorecords.

(c) Defendant may try, within the next twenty days, to make arrangements to return any such phonorecords remaining in its possession to the foreign vendors from which defendant purchased them. If defendant makes any such arrangements, it shall notify plaintiffs' attorneys, and the return of the phonorecords concerned to the foreign vendor or vendors will be effected by defendant at defendant's expense under plaintiffs' supervision in such manner as plaintiffs may deem appropriate to assure themselves that the phonorecords have actually been returned to those vendors. All such phonorecords which have not been returned, as prescribed in the preceding sentence, within the period of twenty days from the date of this Order shall be surrendered by defendant to the plaintiffs, without compensation for destruction.

(d) As used herein, "Phonorecords" includes, but is not limited to, disks, cassettes and any other configurations.

4. Damages are hereby awarded to the plaintiffs against the defendant in the amount of $5,000.00, to be paid by defendant to plaintiffs in equal monthly installments of $500.00 commencing on January 1, 1985 with subsequent payments due the first day of each month thereafter until the total amount is paid. However, this award of damages, and plaintiffs' acceptance of defendant's offer to pay such amount of damages, is based upon defendant's representations to the Court and to plaintiffs on August 23, 1984 concerning the quantities of certain of the phonorecords in question which defendant has imported and sold, reflected in the attached listing. If those

---

**1.** Norton Kalinsky and George Kalinsky were added as Defendants on Plaintiffs' September 25, 1984 oral motion, and the current caption reflects this. The Defendants are generally referred to in plural form, although technically the Kalinskys were not initial parties.

representations later are determined to be substantially inaccurate, the Court, on application by plaintiffs setting forth such inaccuracies, will entertain a request for additional damages, including reasonable attorneys' fees and costs, in accordance with the provisions of Title 17 of the United States Code.

5. Thereafter, on September 14, 1984 Plaintiffs filed their Motion for Civil Contempt, claiming, *inter alia*, that Defendants had blatantly and flagrantly violated the Consent Decree. Plaintiffs subsequently filed a Motion for a Writ of Seizure, seeking the seizure, impoundment and destruction of the alleged offending recordings.[2]

6. A hearing on both motions was held September 19, 1984, and after Plaintiffs demonstrated post-decree sales, a Writ of Seizure was issued. This hearing was continued on September 20, 1984, and on September 25, 1984 the hearing on Plaintiffs' Motion for Civil Contempt was continued.

7. By letter dated October 8, 1984, Defendants' counsel advised Plaintiffs' counsel that Defendants had discovered an additional 223 offending recordings (including 67 Culture Club recordings)[3] and offered them for inspection. This list also included: 30 Carole King, 45 Jane Fonda and 81 miscellaneous recordings.

8. On October 19, 1984 Plaintiffs applied for an *ex parte* writ of seizure, contending that various infringing records were observed at Defendants' warehouse.

It was not the 223 recordings set forth in paragraph 7 above which was the subject of the motion, but rather some 800–900 Canadian recordings, 130 of which were estimated to be Quiet Riot recordings. The Court granted the motion, issued the Writ of Seizure and scheduled a hearing on the seizure.

9. On October 29, 1984 a hearing on the October 19, 1984 *ex parte* seizure was held. The facts demonstrated at the hearings before this Court pertinent to the contempt and seizure issues are set forth below.

10. On September 19 and 20, 1984 a hearing was held in connection with Plaintiffs' Motion for Contempt and for a Writ of Seizure. The following demonstrates that various records were actually sold by Defendants' various stores after the Consent Decree was in effect:

(a) On September 5, 1984, Lauren Carlson, on behalf of Plaintiffs, purchased the Prince "Purple Rain" album from the downtown Record Outlet Store. When she approached the clerks in the store and asked for the Prince album, she was handed a Canadian album from behind the check-out counter.

(b) On September 7, 1984, Michael Kraski, an employee of Plaintiff CBS, purchased various Canadian recordings from the Oakland Record Outlet store. Specifically, he purchased the Jacksons' "Victory" cassette and the Culture Club "Colour By Numbers" cassette.[4]

---

2. Plaintiffs later changed their position with respect to the destruction of the offending recordings and agreed that these recordings could be distributed to charities, so long as no resale would take place.

3. *See* n. 4, *infra.*

4. Regarding the Culture Club "Colour By Numbers" recording, Defendants claim that any violation of the Consent Decree with respect to this recording should not be viewed harshly nor even sanctioned. Defendants argue that it was not obvious to them that Culture Club was infringing material covered by the Decree. In support of this argument Defendants assert that Virgin records is listed on some of the recordings as the manufacturer or copyright holder, although they concede that the Plaintiff Polygram is listed on other copies.

This Court rejects Defendants' arguments and finds that the Culture Club records are covered by the Consent Decree and that Defendants had sufficient knowledge to ascertain this, based on the following: Notwithstanding Norton Kalinsky's testimony that he was unaware that the Culture Club U.S. copyright holder was one of the Plaintiffs, this Court notes that Defendant submitted documents (contained in Plaintiffs' Exhibit 11) which contradict this assertion. The documents are purchase orders, supplied by Defendants, pertaining to records. Norton Kalinsky took it upon himself to blacken out the Canadian source of the recordings as well as what he described as records not of Plaintiffs. Curiously, Culture Club entries are not redacted. Further, and more important, on Defendants' Oakland store inventory records, the record company for the "Colour by Numbers" record-

(c) Further, on September 18, 1984 at the Miracle Mile Record Outlet Store, Mr. Kraski purchased Canadian copies of the Steve Perry "Street Talk" cassette and the Culture Club "Colour By Numbers" cassette.

(d) On September 6, 1984, Mark Wallace, an employee of Plaintiff Warner, bought three Canadian albums at the Record Outlet's Allegheny Mall store. These records were: Rod Stewart's "Camouflage", Laura Brannigan's "Self Control", and Prince's "Purple Rain".

(e) Additionally, on September 18, 1984 Mr. Wallace purchased three more Canadian albums from the Miracle Mile Record Outlet store. These were the Prince "Purple Rain", the Dio "Last in Line" and the Twisted Sister "Stay Hungry" albums.

11. Therefore, the September 19 and 20, 1984 hearing demonstrated that Plaintiffs' employees or representatives purchased 11 offending recordings (8 separate titles) after the effective date of the Consent Decree. These recordings are set forth in Appendix A.

12. After the September 19, 1984 testimony, this Court issued a Writ of Seizure and on September 19 and 20, 1984, the United States Marshals accompanied Plaintiffs' representatives who searched various Record Outlet Stores as well as the warehouse.

13. This search yielded 298 Canadian recordings, each of which was covered by the August 31, 1984 Consent Decree. In all, there were 41 offending titles, 33 of which were newly offending (*i.e.*, titles, although covered by the Decree, which had not been discovered as offending until that time), and which were seized by the U.S. Marshals. A specific listing of the record-

ings seized on September 19 and 20, 1984 is contained in Appendix "B."

14. In addition to the evidence presented at the September 19 and 20, 1984 hearing which demonstrated the sale of recordings covered by the Consent Decree after its effective date, the Plaintiffs also submitted evidence which demonstrated a willful disregard of the Consent Decree by the Defendants. More specifically:

"(a) On September 19, 1984, Mr. Norton Kalinsky testified that he was aware of all of the terms of the Consent Decree when it was originally discussed and negotiated in chambers on August 23, 1984. Although paragraph 3(b) of the Consent Decree provides that Defendants shall within ten days of the Decree furnish Plaintiff a statement *under oath* showing the title and number of units for all phonorecords covered by the Decree which have been sold by the Defendants and which such records remain in Defendants' possession, together with copies of invoices, purchase orders, customs documents and other documentation, Defendants failed to do so by the time provided. Defendants failed to initially furnish a statement under oath, and the 'purchase orders' supplied contained redacted entries, including the source of the phonorecords. Nothing in the Consent Decree permitted Defendants to take it upon themselves to delete entries from the required documents. Moreover, Plaintiffs' Exhibit 11, by Mr. Kalinsky's own admission, does not show the number of records sold, nor does it show the records remaining in Record Outlet's possession. Additionally, it shows returns on only 16 titles, although considerably more are infringing. This material has never been supplemented so as to be in compliance with the Consent Decree.

"(b) Paragraph 3(c) of the Consent Decree which provides, *inter alia*, that re-

---

ing was listed as "Col." which Defendants' employee testified means "Columbia" or "CBS." Moreover, this Court notes that *Billboard,* a trade publication, lists "Colour by Numbers" as a CBS recording. Defendants admit reading *Billboard* and in fact consulting it to determine the Record Outlet "Hot List" to isolate the biggest-selling albums.

Based on the above, this Court finds no merit in Defendants' argument that they were unaware that the Canadian Culture Club recording was Polygram-related and therefore offending. Accordingly, this Court finds "Colour by Numbers" of Canadian origin to be offending.

garding any return of recordings to Canada Defendants were under an obligation to notify Plaintiffs so that they could supervise the returns. Mr. Norton Kalinsky admitted that he made returns to Canada without first notifying the Plaintiffs, and further that he understood the Court's direction in this regard. Mr. Kalinsky further testified that on August 28 and 29, 1984 he made shipments to Canada of record albums totalling 3,842 recordings and 1,663 recordings respectively. Thus, approximately 5,000 recordings were shipped back to Canada, without Plaintiffs' supervision as required by the Consent Decree. This Court finds that the secretive manner in which Defendants returned recordings to Canada has deprived Plaintiffs of the accurate accounting negotiated in the Consent Decree, and is a willful violation.

"(c) On September 19, 1984 Mr. Norton Kalinsky also testified that he was aware that he was not to sell any offending records after the date provided in the Consent Decree (August 24, 1984). He also testified that instructions to this effect were given to his employees. However, testimony elicited during the hearings indicated that Record Outlet employees were not given explicit instructions not to sell Canadian recordings covered by the Consent Decree, and in some instances were instructed to sell infringing material.

"In this connection, on September 19, 1984, Stephanie Smith, a clerk in the downtown Record Outlet store, testified that she was not told to check every tape or album prior to sale to ascertain whether it was offending material. Additionally, Larry Krueger, the former manager of the Oakland Record Outlet, also indicated that he was not given instructions by anyone in charge not to sell the Canadian recordings. In fact, to the contrary, after the records were shipped to Canada, Mr. Krueger noted that two tapes were returned, a Culture Club 'Colour By Numbers' and a Jackson's 'Victory,' *and he was instructed by George Kalinsky to sell them.* This Court notes that George Kalinsky never testified before this Court to refute this damaging testimo-

ny. Although his counsel admits his general behavior in this regard was improper, at no time was any acceptable justification offered.

"(d) Further, in direct defiance to the Consent Decree, certain employees were instructed to 'switch' American Prince albums brought to the checkout counter with the Canadian Prince albums placed behind the counter in both the Oakland and downtown stores. Moreover, as noted in ¶ 10(a) above, Lauren Carlson testified that when purchasing a Prince album from the downtown store, a clerk handed her a Canadian Prince album which was stored behind the check-out counter. Although the Defendants attempted to rebut this testimony by demonstrating that with respect to 'hot', *i.e.,* top-selling albums, stock was kept behind the counter due to their popularity, because certain of Defendants' employees testified that they were instructed to replace American Prince albums with Canadian albums, this Court finds this practice to constitute willful defiance of the Consent Decree.

"Moreover, Larry Krueger testified that after Canadian records were shipped back in late August that approximately 30 Prince albums of Canadian origin were placed behind the check-out counter. Mr. Krueger further testified that American Prince records brought to the counter by customers were 'switched' for a Canadian Prince record on different occasions. He indicated that this practice was attributable to George Kalinsky, although he did not personally receive these instructions.

"Mr. Krueger also testified that he observed the practice of exchanging Prince albums from behind the counter when he worked in the downtown store in early September. Mr. Krueger further testified that he may have switched one or two Canadian Prince albums.

"In this connection, Jill Douglas, the former assistant manager and present manager of the Oakland Record Outlet store, testified that after the original transmission of the Canadian records back to Cana-

da in late August, she was aware that Frank Talento, an employee of Record Outlet, discovered approximately 20 Canadian Prince albums, which were placed behind the check-out counter at George Kalinsky's direction in order to 'switch' Prince albums brought to the counter by customers. Ms. Douglas testified that on approximately two occasions she followed this procedure. She further noted that these records were eventually taken 'back to the warehouse or downtown.'

"Also, on September 25, 1984, Frank Talento testified that upon discovering approximately 30 Canadian Prince albums in the Oakland store and being aware that they were Canadian and not 'supposed to be there', he called George Kalinsky to find out what to do with them. Mr. George Kalinsky told him to put the albums behind the counter and 'try to get rid of them.'

"The existence of this practice was even further substantiated by the testimony of Margie Darnley, an employee of Record Outlet who testified that she was instructed by George Kalinsky to switch American Prince albums brought to the check-out counter for Canadian Prince albums. This transpired at the downtown store on a Saturday.

"Mr. Krueger further stated that on one occasion when he worked at the downtown store, George Kalinsky directed that the Canadian Prince albums be put out on display two or three at a time, and when sold, replaced.

"Again, this contumatious and deliberate behavior is attributable to George Kalinsky and similary no acceptable reason was proffered."

Therefore, based upon the foregoing, this Court finds that Plaintiffs have proved that Defendants have *willfully* violated the Consent Decree on at least four occasions, as set forth in (a) through (d) above.

15. Additionally, during the October 24, 1984 hearing on the *ex parte* Writ of Seizure and the continuing contempt, the following was shown:

(a) On October 19, 1984, and as a result of *ex parte* search of Defendants' warehouse and Bridgeville store by Plaintiffs, U.S. Marshals seized 217 infringing recordings, 24 separate titles, 8 of which were newly offending. These recordings are listed in Appendix "C."

(b) Of the above, some were segregated from and others were integrated into the regular stock.

(c) Of the recordings noted in (a) above, six of these were the Quiet Riot "Condition Critical" albums, and these were mixed with the American stock.

(d) Of these 217 recordings, one Canadian (Dan Fogelberg) cassette tape was found on the selling floor.

(e) Additionally, 17 of Plaintiff Polygram's Canadian recordings, 6 different titles, were identified during the seizure, 2 of which were newly offending. These were later produced at the hearing. A list of these is set forth in Appendix "D."

(f) Therefore, the total number of offending recordings discovered on October 19, 1984 were 234 recordings.

16. Additionally, on October 29, 1984 Jerry Noftz, an employee of RCA Records, testified that on October 17, 1984, while inside the Record Outlet warehouse on a parallel matter (concerning his employer and other record company plaintiffs), he observed some offending recordings in connection with this case. Specifically, he testified that an "ultra conservative" estimate of the number of recordings was 300 CBS and Warner recordings, 150 of which were CBS Quiet Riot recordings (100 albums and 50 cassettes). He further stated that "out of curiosity" he randomly checked six or so of the Quiet Riot albums and all were Canadian product. The remainder of the 300 albums referenced above were Prince, Motley Crew and Twisted Sister. He randomly checked about a dozen of these, and all were Canadian product. Further, he stated that on October 17, 1984 the CBS product (Quiet Riot) was located four bins back from the wall, waist/chest high. The War-

ner product (Prince, Motley Crew and Twisted Sister) was located on the top shelf three bins back from the wall.[5]

17. Comparing the figures referenced in ¶¶ 15 and 16 with the 223 offending recordings admitted to by Defendants in the October 8, 1984 letter written by counsel, the Court concludes and notes the following:

(a) This Court concludes that Mr. Noftz is qualified to estimate quantities of albums and tapes.

(b) There were six Quiet Riot recordings seized on October 19, 1984 and Mr. Noftz saw six offending Quiet Riot albums on an earlier date. This Court finds the testimony of Mr. Noftz credible; it is incredulous that when faced with some 100 albums, his random checking uncovered the *only* six Canadian albums. The fact that these recordings were not in the same position as the CBS albums were two days later further substantiates this finding.

(c) Additionally, this Court finds that with respect to the Motley Crew albums seen by Mr. Noftz on October 17, 1984 that the absence of any such recordings seized by the marshals two days later indicates that these recordings were moved out of the warehouse prior to the time of the seizure.

(d) With respect to the Twisted Sister and Prince albums, the Court likewise concludes that those observed by Mr. Noftz were not the same recordings as those seized by the marshals two days later. (Supporting this conclusion is the fact that the Court finds it incredulous that Mr. Noftz' random checking uncovered every Canadian album in the stack and all those not checked were nonoffending as well as the fact that the albums were moved within the two days.)

(e) This Court concludes that some of the 223 recordings reported by Defend-

ants on October 8, 1984, as infringing were seized by the marshals on October 19, 1984. However, of the 234 recordings actually seized that day, the Court has no way of determining which ones were from the 223 recordings reported by the Defendants, particularly since the Court has found 300 recordings to have been in the warehouse on October 17 and absent two days later. The fact that the numbers reported do not coincide with the numbers confiscated as well as the absence of the 300 recordings referenced above indicate that Defendants were "moving" the recordings or using them in some way violative of the Consent Decree.

(f) Additionally, this Court concludes that sometime between the time Mr. Noftz was in the warehouse and the time the marshals seized the 234 recordings, 300 offending recordings were removed from the warehouse for sale or for some other use contrary to the provisions of the Consent Decree. Of these, the Court deems 150 to be Quiet Riot (CBS), and 150 to be Prince, Motley Crew and Twisted Sister recordings (Warner).

18. Therefore, based on the foregoing, this Court finds that the Consent Decree was willfully violated by Defendants and further, that in any event, the Defendants never took adequate steps to insure that their employees not sell offending Canadian recordings, or to otherwise comply with its terms.

19. Accordingly, based on the aforementioned, this Court finds Defendants in civil contempt for their multiple violations of the Consent Decree, and finds Defendants jointly and severally adjudged in civil contempt.

### CONCLUSIONS OF LAW

20. Civil contempt liability attaches upon violation of a court order of

---

**5.** In contrast, Wayne Dobson, an employee of Record Outlet, testified that two days later, on October 19, 1984 the Warner product was locat-

ed underneath the CBS product which was on the "top shelf left."

which the recalcitrant individual had actual notice. *Thompson v. Johnson,* 410 F.Supp. 633 (E.D.Pa.1976), *aff'd without opinion,* 556 F.2d 568 (3d Cir.1977).

21. Further, behavior may be construed as contemptuous even in the absence of wilfulness. *McComb v. Jacksonville Paper Company,* 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949). Moreover, a single act of contempt may give rise to sanctions. *Latrobe Steel Company v. United Steel Workers of America,* 545 F.2d 1336, 1343 (3d Cir.1976).

22. Civil contempt, as opposed to criminal contempt, "is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance." *McComb v. Jacksonville Paper Company,* 336 U.S. at 191, 69 S.Ct. at 499.

Thus, whereas the essential purpose of criminal contempt is to vindicate the court's authority, "the objective of a civil contempt decree is to benefit the complainant." *Latrobe Steel Company v. United Steel Workers of America,* 545 F.2d at 1343 (footnote omitted). *See also, e.g., United States v. United Mine Workers,* 330 U.S. 258, 295, 67 S.Ct. 677, 696, 91 L.Ed. 884 (1947).

23. There are two general categories of sanctions in civil contempt actions, remedial or compensatory as well as coercive, each having a distinctive purpose. Compensatory sanctions are retrospective and seek to compensate the victim for the damages caused by the contumacious party's disobedience. However, coercive sanctions are prospective in nature and seek to assure future compliance. *Latrobe Steel Company v. United States Steel Workers of America,* 545 F.2d at 1344. In the situa-

tion of a coercive fine, the monies paid would not go to the plaintiff, but rather to the court, since its purpose is to "vindicate the integrity of the judicial process." *Id.* at 1346.

24. The district court is given broad discretion in fashioning a remedy for civil contempt. *See e.g., Delaware Valley Citizens Council for Clean Air v. Commonwealth of Pennsylvania,* 678 F.2d 470, 478 (3d Cir.1982).

25. With respect to compensatory or remedial damages, in appropriate cases, the Court may award not only award damages and costs, but reasonable attorneys' fees "necessary to secure the contemnor's compliance with the court's order." *Thompson v. Johnson,* 410 F.Supp. at 643.[6]

## SANCTIONS ·

With the above standards in mind, this Court, having found the Defendants in civil contempt, both for willful disregard of the Consent Decree and due to their failure to comply (willful or not) with its terms, hereby sanctions as follows:

(1) With respect to the recordings actually sold after the Consent Decree (*see* Appendix A and ¶¶ 10 and 11), Defendants shall pay the appropriate Plaintiff in accordance with the following formula:

$1000 per title (initial infringement only)[7] and $100 for each additional copy.[8]

Thus, under this section, the total amount to be paid all Plaintiffs by Defendants is $8,000 (8 titles) plus $300 (3 additional copies) = $8,300.

In computing what amounts are due each Plaintiff, the parties shall consult Appendix A for the breakdown of the specific copy-

---

**6.** Costs, as well, are limited to those incurred in connection with the contempt, not the original suit. *Thompson v. Johnson,* 410 F.Supp. at 643.

**7.** The Court finds the actual *sale* of the infringing material to be more egregious than possession, although both violate the Consent Decree. Accordingly, Defendants are fined four times the minimum penalty for infringement under 17 U.S.C. § 504(c).

**8.** With respect to violations after the first infringement of a particular title, Defendants are fined one-tenth the fine for the initial infringement. A distinction is made here because while the initial infringement is the most offensive, the Court finds that Defendants should also be sanctioned in proportion to volume, but not to the same degree.

right holders, the initial offending titles and the number of offending copies.

(2) With respect to recordings seized after the Consent Decree (*see* Appendices B, C and D), Defendants shall pay the appropriate Plaintiffs in accordance with the following formula:

$250 per title (initial infringement only)[9] and $25 for each additional copy.[10]

Thus, under this section, the Defendants shall pay Plaintiffs the following:

(a) re: Appendix B

| | | |
|---|---|---|
| 33 initial titles | = | $ 8,250 |
| 265 additional copies | = | 6,625 |
| Total | | $14,875 |

(b) re: Appendix C

| | | |
|---|---|---|
| 8 initial titles | = | $ 2,000 |
| 209 additional copies | = | 5,225 |
| Total | = | $ 7,225 |

(c) re: Appendix D (only Polygram)

| | | |
|---|---|---|
| 2 initial titles | = | $ 500 |
| 15 additional copies | = | 375 |
| Total | | $ 875 |

In computing what specific amounts are due each Plaintiff, the parties shall consult Appendices B, C and D for the breakdown of the copyright holders, the initial offending titles and the number of offending copies.

(d) re: 300 albums deemed to be present in warehouse (*see* ¶ 17(f)).

300 copies (none determined to be initial violation) = $7,500

Given the testimony, since 150 of these are stated to be Quiet Riot, half of this amount shall go to CBS, and the other half to Warner (for the 150 of Prince, Motley Crew and Twisted Sister recordings).

(3) With respect to the 223 recordings admitted by Defendants to be in their possession after the effective date of the Consent Decree, this Court finds that some credit for these infringing items is appropriate. Thus, because Defendants took steps to purge their contempt, some credit will be given. However, because this possession was nonetheless contrary to the Consent Decree, full credit cannot attach. Accordingly, Defendants will be credited $12.50 per recording, mentioned by name by Defendants in the October 8, 1984 letter. Credit cannot be given for the "81 miscellaneous" recordings.[11]

(4) Additionally, with respect to Defendants' willful violation of the Consent Decree (*see* ¶ 14(a)–(d)) this Court sanctions Defendants $5,000 for each such violation.[12] Thus this amount totals $20,000.

(5) Accordingly, the total amount due Plaintiffs is $57,000.

(6) This Court further finds that Plaintiffs are entitled to be compensated by Defendants for the reasonable attorneys' fees incurred in connection with Defendants' post-decree contempt, which necessitated Plaintiffs' return to Court to enforce the Consent Decree.

(7) Likewise, Defendants shall pay Plaintiffs the costs incurred in connection with Defendants' post-decree contempt, which necessitated Plaintiffs' return to court to enforce the Consent Decree.

(8) Further, in the event that Defendants subsequently violate the Consent Decree, Defendants will be sanctioned a coercive fine of $1000 per recording, irrespective of duplications in titles. This prospective sanction is to be paid to the Court rather than the Plaintiffs, unlike the other fines.

(9) Additionally, Defendants shall forfeit all recordings in the custody of the

---

**9.** With respect to the possession of infringing material in defiance of the Consent Decree, the Court finds the minimum fine set forth in 17 U.S.C. § 504(c) to be appropriate.

**10.** *See* n. 8, *supra*.

**11.** Thus, the total credit for the 30 Carole King, the 45 Jane Fonda and the 67 Culture Club is $1775.

**12.** This Court finds $5000 for each willful violation to be an appropriate fine, given that this amount was negotiated in the Consent Decree. Accordingly, it is certainly more than reasonable that Defendants pay this amount on each *willful* violation subsequent to the Consent Decree.

Court. These recordings shall be distributed to charities chosen by the Court after these recordings are marked by Plaintiffs to indicate that resale is prohibited. Although destruction of the infringing material is authorized under the copyright laws, it is to be noted that Plaintiffs have willingly consented to charitable distribution of this material.

An appropriate Order shall issue.

### ORDER

And now, this 14th day of December, 1984, in conformity with the foregoing Opinion, Plaintiff's Motion for Civil Contempt is GRANTED, and it is hereby ORDERED, ADJUDGED and DECREED that the Defendants are in civil contempt of this Court. In further conformity with this Opinion, as sanctions, Defendants shall pay Plaintiffs a total amount of $57,000 ($58,775 less $1775) for this contempt, plus reasonable attorneys' fees and costs incurred by Plaintiffs attributable to the contempt aspect of this matter.

In calculating what amounts are due each Plaintiff, the parties shall consult the Appendices annexed hereto as well as the body of the Opinion, which sets forth the other recordings not listed in the Appendices and the credit allowable to the Defendants.

Judgment is entered accordingly.

### APPENDIX "A"

| ARTIST | TITLE | U.S. COPYRIGHT | NO. OFFENDING RECORDINGS |
|---|---|---|---|
| Prince | Purple Rain | Warner Bros. | 3 |
| Jacksons | Victory | CBS | 1 |
| Steve Perry | Street Talk | CBS | 1 |
| Culture Club | Colour by Numbers | Polygram | 2 |
| Rod Stewart | Camoflage | WEA | 1 |
| Laura Branigan | Self Control | Atlantic | 1 |
| Dio | Last in Line | Warner Bros. | 1 |
| Twisted Sister | Stay Hungry | Atlantic | 1 |

Total offending titles: 8

Total offending recordings: 11

### APPENDIX "B"

| ARTIST | TITLE | U.S. COPYRIGHT | NO. OFFENDING RECORDINGS |
|---|---|---|---|
| Orig. Sound Track | All the Right Moves | Polygram | 2 |
| " | Footloose | CBS | 7 |
| " | Flashdance | Polygram | 21 |
| " | Cats | WEA | 1 |
| " | Indiana Jones and the Temple of Doom | ** Lucasfilm Ltd (Polygram) | 1 |
| " | Beat Street | ** Orion Pictures Corp. (Atlantic) | 3 |
| " | Breakin | Polygram | 1 |
| " | An Officer and a Gentleman | ** Paramount Pictures (WEA) | 4 |
| " | Staying Alive | ** Paramount Pictures (Polygram) | 1 |
| * Culture Club | Colour by Numbers | Polygram | 179 |
| Def Leppard | Pyromania | Polygram | 1 |
| Luciano Pavarotti | Luciano | Polygram | 3 |
| " | Pavarotti's Greatest Hits Vol. 1 | " | 3 |

| ARTIST | TITLE | U.S. COPYRIGHT | NO. OFFENDING RECORDINGS |
|--------|-------|----------------|--------------------------|
| " | Pavarotti's Greatest Hits Vol. 2 | " | 1 |
| " | O Holy Night | " | 1 |
| " | O Sole Mio | " | 1 |
| * Steve Perry | Street Talk | CBS | 12 |
| Jane Fonda | Workout | ** The Workout, Inc. (CBS) | 4 |
| Cyndi Lauper | She's So Unusual | CBS | 3 |
| Dan Fogelberg | Windows and Walls | CBS | 1 |
| John Cougar | Mellen Camp/Uh-huh | Polygram | 3 |
| Michael Jackson | Off the Wall | CBS | 1 |
| * Rod Stewart | Camoflage | WEA | 3 |
| Julio Inglesias | Julio | CBS | 1 |
| Elton John | Breaking Hearts | ** Happenstance Ltd. (WEA) | 1 |
| * Twisted Sister | Stay Hungry | Atlantic | 4 |
| Patti Austin | Patti Austin | Qwest | 1 |
| * Prince | Purple Rain | Warner Bros. | 1 |
| Cars | Heartbeat City | Elektra/Asylum | 2 |
| .* Dio | Last in Line | Warner Bros. | 4 |
| Slade | Keep Your Hands Off | CBS | 2 |
| Inxs | The Swing | Atlantic | 3 |
| Rush | Grace Under Pressure | ** CAT Productions (Polygram) | 1 |
| Night Ranger | Midnight Madness | CBS | 7 |
| Linda Ronstadt | What's New | Elektra | 2 |
| * Laura Branigan | Self Control | Atlantic | 2 |
| ZZ Top | Eliminator | Warner Bros. | 3 |
| Van Halen | 1984 | Warner Bros. | 1 |
| * Jacksons | Victory | CBS | 3 |
| John Lennon/ Yoko Ono | Milk and Honey | Polygram | 2 |
| David Sanborn | Backstreet | Warner Bros. | 1 |

Total offending titles:         41

Total offending recordings:         298

Total titles not previously listed as offending:   33

---

\* Previously listed as an offending title.

\*\* With respect to these recordings, the copyright holder is an entity other than one of the Plaintiffs, but one of the Plaintiffs in each instance has the distribution rights, and is indicated in the parentheses. This information was gleaned from Plaintiff's Exhibit 24 as well as the jackets of actual recordings. It is to be noted, in any event, Defendants do not dispute that these particular recordings are infringing.

## APPENDIX "C"

| ARTIST | TITLE | U.S. COPYRIGHT | NO. OFFENDING RECORDINGS |
|--------|-------|----------------|--------------------------|
| * Culture Club | Colour by Numbers | Polygram | 67 |
| Quiet Riot | Condition Critical | CBS | 6 |
| Neil Diamond | Primitive | CBS | 8 |
| * Twisted Sister | Stay Hungry | Atlantic | 9 |
| * Slade | Keep Your Hands Off | CBS | 6 |

| ARTIST | TITLE | U.S. COPYRIGHT | NO. OFFENDING RECORDINGS |
|---|---|---|---|
| * Cars | Heartbeat City | Elektra/Asylum | *** 4 |
| Bruce Springstein | The River | CBS | 1 |
| * Michael Jackson | Off the Wall | CBS | 6 |
| * Jacksons | Victory | CBS | *** 4 |
| Berlin | Love Life | ** David Geffen Co. (WEA) | 2 |
| * Inxs | The Swing | Atlantic | 2 |
| * Billy Joel | Innocent Man | CBS | 1 |
| * Jane Fonda | Workout | ** The Workout, Inc. (CBS) | *** 41 |
| Midnight Star | No Parking on the Dancefloor | ** Solar Records, (WEA) | 2 |
| Teddy Pendergrass | Love Language | Elektra/Asylum | 1 |
| * Elton John | Breaking Hearts | ** Happenstance, Ltd. (WEA) | 1 |
| Carole King | Tapestry | CBS | 37 |
| * Prince | Purple Rain | Warner Bros. | *** 4 |
| * Rod Stewart | Camoflage | WEA | 1 |
| * Dan Fogelberg | Windows and Walls | CBS | *** 2 |
| * Orig. Sound Track | Beat Street | ** Orion Pictures Corp. (Atlantic) | 3 |
| " | Against All Odds | ** Columbia Pictures Ind., Inc., (WEA) | 2 |
| * " | Cats | WEA | 3 |
| * " | Footloose | CBS | 4 |

Total offending titles: 24

Total offending recordings: 217

Total titles not previously listed as offending: 8

---

* Previously listed as offending title

** With respect to these recordings, the copyright holder is an entity other than one of the Plaintiffs, but one of the Plaintiffs in each instance has the distribution rights, and is indicated in the parentheses. This information was gleaned from Plaintiff's Exhibit 24 as well as the jackets of actual recordings. It is to be noted, in any event, Defendants do not dispute that these particular recordings are infringing.

*** Court count differs slightly from U.S. Marshal count.

## APPENDIX "D": POLYGRAM

| ARTIST | TITLE | NO. OFFENDING RECORDINGS |
|---|---|---|
| * Def Leppard | Pyromania | 1 |
| * Luciano Pavarotti | Greatest Hits Vol. 1 | 1 |
| " | The Great Pavarotti | 1 |
| Cameo | She's Strange | 2 |
| * John Lennon/Yoko Ono | Milk and Honey | 2 |
| * John Cougar | Mellen Camp Uh-huh | 1 |
| * Orig. Sound Track | Flashdance | 9 |

Total offending titles: 7

Total offending recordings: 17

Total titles not previously listed as offending: 2

---

* Previously listed as an offending title.